**Daniel Ryan GARRETT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69426.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 13, 1993.

Rehearing Denied April 21, 1993.

Ray Bass, Austin, for appellant.

John B. Holmes, Jr., Dist. Atty. and Cathleen C. Herasimchuk, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

CLINTON, Judge.

Appellant was convicted of the offense of capital murder pursuant to V.T.C.A. Penal Code, § 19.03(a)(2). The jury answered the two special issues affirmatively during the punishment phase and appellant was sentenced to death. Article 37.071, § (b), V.A.C.C.P. Appeal is automatic to this Court. *Id.*, § (h). Appellant raises thirteen points of error. Because appellant makes a claim of insufficiency of the evidence to support the conviction, a recitation of the facts is necessary.

On the morning of June 13, 1983, Gregory Scott Traver, a friend and co-worker of Jerry Lynn Dean, waited for Dean to pick him up for work as he did every morning. Dean usually arrived at 6:40 a.m. When he did not show up by 6:50 a.m., Traver walked the short distance to Dean's apartment to meet him. Traver knocked on the door and, receiving no response, he walked

into the unlocked apartment. Inside Traver noticed that the motorcycle which Dean was building was no longer in the living room, the television had been moved to the floor and the radio was blaring. Traver found Dean in the spare bedroom. Dean was lying on a mattress. At first glance, Traver thought he had been in a fight; however, upon closer examination, he realized Dean had blood on his head, holes in his chest and "looked like he'd been butchered." Lying next to Dean was the bloody body of a woman, a pickax protruding out of her chest. The woman was later identified as Deborah Thornton. Traver ran out of the apartment and called the police. A pathologist with the Harris County Medical Examiner's Office estimated the time of death at between 4:00 a.m. and 6:30 a.m.

Appellant had become acquainted with Dean through his girlfriend, Karla Faye Tucker.[1] Karla met Dean when he was dating her roommate, Shawn Jackson, who subsequently became his wife. Karla's dislike of Dean began when Dean parked his motorcycle in her and Shawn's apartment living room with oil dripping onto the rug. After Dean failed to remove it, Karla punched him. On the day Shawn and Dean were married, Karla and her sister Kari moved into a house with appellant. Ronnie Burrell, Kari's ex-husband also moved into the house at a later date. After Shawn was married, she went to Karla's house to pick up some of her clothes which were in Karla's possession. When Karla discovered that Dean was outside waiting for Shawn, she ran outside and punched him in the eye. Shawn eventually moved in with appellant and Karla after an altercation with Dean in which he "punched her in the nose." Around this time discussions were had about stealing Dean's motorcycle. Thereafter, plans to steal Dean's motorcycle were discussed frequently. During one of these discussions, appellant stated that if Dean was present when the theft was taking place, he would have to be killed. When discussions of killing Dean evolved, Shawn decided she did not want to partici-

pate in the theft. Burrell also testified that a number of times appellant discussed going to Dean's house to steal his motorcycle, his car and other items, and killing him.

Shawn testified that upon moving out from the apartment she shared with Dean, she retained a set of keys to the apartment and to the El Camino which belonged to Dean. She also testified that the keys were missing a short time before Dean's death and were never recovered. Karla testified that she found and kept the keys which Shawn misplaced, but never revealed this to Shawn; she did however, relate this information to appellant. Shawn also took Dean's bank card when she moved out of their apartment and she, Karla and Kari each withdrew the money from the account.

On the weekend immediately preceding June 13, 1983, a birthday party was thrown for Kari at appellant's house. By Sunday evening, only a few people remained at the house, including appellant, Karla, Kari, Burrell and a friend of Burrell's named Jimmy Liebrandt. At approximately 6:30 p.m. or 7:00 p.m., appellant left for work and Kari left the house. Karla and Liebrandt remained at the home and continued to ingest marijuana, speed, and dilaudids. Appellant returned from his job as a bartender between 3:30 a.m. and 4:30 a.m. and soon thereafter, ingested some speed with Karla and Liebrandt. Karla testified that subsequent to the shot of speed, Liebrandt began pacing back and forth and stated that if he did not do something soon, he would go crazy. At this point, appellant stated he knew what they could do and began drawing a floor plan to Dean's apartment. Appellant suggested the three of them go to Dean's apartment and case the place, and as appellant, Karla and Liebrandt left the house, appellant grabbed his shotgun.

After arriving at Dean's apartment, appellant, Karla and Liebrandt split up to look around the apartment complex. Appellant met Karla at the front door and told

---

1. Karla Faye Tucker was convicted of capital murder for the death of Dean and sentenced to death. This Court upheld her conviction on appeal. See *Tucker v. State*, 771 S.W.2d 523 (Tex.Cr.App.1988).

her to open it, so Karla retrieved the keys that belonged to Shawn and opened the door. Upon opening the door, Dean said "What's going on?" and without answering, appellant and Karla walked to the bedroom doorway and saw a silhouette of Dean sitting on a mattress on the floor. Karla walked past appellant and sat on Dean's lap. In a scared voice, Dean said "We could work it out," referring to the bank account which Karla helped deplete. Karla told Dean to shut up and began wrestling with him. Dean grabbed her arms and as she tried to break loose, appellant pushed the two apart, knocking Karla to the ground. As Karla stood up she saw a silhouette of appellant hitting Dean in the head with a ball peen hammer. When Karla turned on the light, appellant ceased hitting Dean who was now face down, and walked out of the room. As Karla stood over Dean, he made a gurgling noise. Karla picked up a pickax laying against the wall and began hitting him. The gurgling did not cease and as appellant walked back into the room, Karla asked appellant to make it stop. Appellant took the pickax from Karla and hit Dean until the noise stopped. As Karla was swinging the pickax on Dean, she saw Liebrandt in the hallway bending over to pick up a box. Karla did not know what appellant was doing as she was pickaxing Dean.

Once Karla finished pickaxing Dean and appellant left the room, she noticed a body shaking under the sheets next to Dean. Karla began pickaxing the body and a woman came up from under the sheets and grabbed the pickax. The woman, Deborah Thornton, began to overpower Karla and at that moment, appellant walked into the room, grabbed the pickax and pushed Karla back. Karla left the room, went into the living room, picked up two boxes containing motorcycle parts and carried them out to appellant's truck, noticing that several boxes had already been loaded into the truck. Karla walked back to the apartment and into the bedroom where she saw Thornton sitting on the edge of the mattress with the pickax stuck in her shoulder. Karla heard Thornton say, "Oh, God! It hurts. If you're going to kill me, please

hurry up." Appellant kicked her in the head and as she fell back, he pulled the pickax out of her shoulder and swung it into her chest. Karla left the room. When appellant came into the living room he told Karla to help him carry the motorcycle frame out of the living room and into the truck. The frame was put in the bed of Dean's El Camino and Karla used Shawn's keys to drive the car to appellant's brother's house.

Once Karla arrived at Doug Garrett's house, she told him that she and appellant had killed Dean. Karla asked Doug for help in unloading the motorcycle out of the El Camino and into his garage. Appellant arrived shortly afterwards with Liebrandt and Burrell and after unloading some boxes, appellant, Karla, Liebrandt and Burrell left in appellant's vehicle. Appellant, and his girlfriend, Karla, were arrested on July 20, 1983, for the pickax murders.

■ In his first point of error, appellant alleges the evidence is insufficient to support a conviction for capital murder as alleged in the indictment. To support this contention, appellant argues that the evidence fails to establish any assaultive conduct directed towards Dean that occurred to facilitate the taking of his property. He also asserts there were no objective manifestations of an intent to obtain property when appellant joined the assault in aid of Karla. Additionally, appellant argues Dean was not the victim of a robbery because the State's evidence demonstrates the assault on Dean was motivated by Karla's anger, not to facilitate the taking of property.

■ This Court has defined "in the course of committing" an offense listed in § 19.03(a)(2), supra, as conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense. *Riles v. State*, 595 S.W.2d 858, 862 (Tex.Cr. App.1980). Evidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before or contemporaneously with the murder. See

*White v. State,* 779 S.W.2d 809 (Tex.Cr. App.1989).

In the case at bar, there is ample evidence that appellant formed the intent to commit the robbery before the commission of the murder. Shawn testified that she is the one who suggested to Karla that Dean's motorcycle be stolen, and Karla corroborated this testimony. Kari testified that she heard her sister Karla talking about stealing Dean's motorcycle and she heard the appellant talk about stealing his car so he could use the parts for his vehicle. Doug likewise testified that he had heard discussions between the appellant and Karla in which they were planning to steal Dean's motorcycle. Burrell also took the stand and testified that he heard Karla state that she was going to "off" Dean because of a contract that he supposedly put out on her. Burrell stated that Karla said Dean did not deserve a motorcycle and that she was going to take it away from him. Burrell stated that he was invited by both appellant and Karla to go over to Dean's apartment with them and that on more than one occasion, appellant discussed the details of killing Dean. Appellant also told Burrell that when he was loading boxes into his pick up truck, he had to stop and help Karla who was being overpowered by Thornton. Karla testified that appellant was instrumental in planning the event. It was his idea to go to Dean's apartment on the night of the murders. He drew the diagram of appellant's apartment. And he is the one who on an earlier occasion suggested that Dean would have to be killed if he was present when they went over to steal the motorcycle. Lastly, Karla stated that both she and appellant loaded the motorcycle into Dean's car after Thornton had been killed.

■ When reviewing sufficiency of the evidence this Court must decide "whether, after viewing the evidence in the light most favorable to the prosecution any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307 at 319, 99 S.Ct. 2781 at 2789, 61 L.Ed.2d 560 at 573 (1979). The testimony given at trial indicates that appellant formed the intent to kill Dean and take his property well before the actual date that the murders occurred. Testimony from both Shawn and Burrell indicated that appellant had discussed "offing" Dean if he was present when they stole the motorcycle. After the murders, appellant completed the theft by loading the motorcycle into Dean's car. From this testimony, along with the actual taking of the motorcycle, a rational trier of fact could conclude beyond a reasonable doubt that appellant committed the murder while in the course of robbery. *Tucker,* 771 S.W.2d at 523. Appellant's first point of error is overruled.

■ Appellant's second point of error alleges the trial court reversibly erred by granting, over timely objection by appellant, the State's challenge for cause to venireman Peter K. Bradley. The State may challenge a venireman for cause if "he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." Article 35.-16(b)(3), V.A.C.C.P. During questioning of venireman Bradley, the subject of the second special issue was discussed: [2]

"Q: Looking at that question, do you think it's possible to conclude in some circumstances that the answer to Question 2 should be yes, based on nothing more than the facts of the case itself?

And by that, I mean this. The law would allow, if a jury so chose, would allow for a jury to conclude that the evidence in the case called for an answer of yes based solely on the defendant's conduct during the crime that he or she was convicted of.

A: No, sir. I do not think you could answer it then from that information.

2. Former Article 37.071(b)(2) V.A.C.C.P., recodified since appellant's trial, see Acts 1991, 72nd Leg., ch. 838, p. 2899, § 1, eff. Sept. 1, 1991, now Article 37.071 § 2(b)(1), V.A.C.C.P., reads as follows:

"whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

Q: That no matter—in other words, you would want more than just the facts of the case?

A: Yes, sir, I believe it would be required.

Q: All right. Now, wanting more than just the facts of the case is perfectly legitimate. The next thing, and I want you to correct me if you feel I'm misstating this, as we go along, with your views. My question is, do you feel that in all situations, no matter what the facts of the case alone is, that you could never answer Question 2 yes based on just the facts of the case?

A: Yes, sir, I agree with that statement. You cannot answer yes to Issue 2 without additional—without additional information.

Q: Okay.... Knowing then that capital murder and the opportunities to be there answering those two questions in and of itself occurs only in the most severe type of cases, would it still be your position that no matter what the evidence, no matter how severe the crime, no matter how bad the defendant's conduct in the crime, that you could never answer Question 2 yes based on just the facts of the case?

A: Yes, sir, it is. Can I explain?

Q: Sure. Please.

A: If we believe that history of behavior is a good predictor of the future, then we can answer Issue 2. Okay. However, any scientist that would jump off on one incident and say this constitutes history, and I'm going to predict the future on it, I say can go—you know, if you take a point here and say okay, which direction is the future, if you've only got one point, the future can be anywhere. Okay?

Now if you've got two points or four points or five points, you can say aha, the future. That way. Okay. So you can—you can't answer 2, you can't prognosticate to the basis of one, one piece of evidence in a scientific sense, not in the legal sense.

\*    \*    \*    \*    \*    \*

Q: Okay. Would it be a fair statement that in your mind no one single act would ever, no matter how the person, what that act is, no matter how horrible that act is, or no one single event is, would ever allow you to be able to conclude that that person, that there was a probability that person would commit acts of violence in the future?

A: Yes, sir.

Q: And as I understand what you're saying, it's because the only way you would ever feel comfortable would be for some type of track record?

A: Yes, sir.

Q: And without any type of track record, good or bad, you would never be able to conclude that answer to Question 2 should be yes?

A: That's right, sir.

\*    \*    \*    \*    \*    \*

A: ... Without other evidence, I cannot in good conscience, understanding as I understand it, Issue 2, answer yes to Issue 2 without additional evidence.

Q: Okay. In other words, no matter what your revulsion as to that individual as a person, as he is portrayed during that crime, and no matter what you're [sic] revulsion as to the facts of the crime itself, the facts of the crime itself, and a defendant's conduct in that crime would never be sufficient for you to conclude, no matter how horrible, that the answer to Question 2 should be yes?

A: Yes, sir.

Q: Would you be likely to be persuaded, I mean—would it be a fair statement that nothing I say or Mr. Bass says or the Judge says can change your mind about that?

A: No, sir. I have had—that's been ingrained in me by people who have had a lot more time to talk to me than you have.

\*    \*    \*    \*    \*    \*

Q: So that I'm clear, that's in your mind, asking you to predict the future. And if you did it based on the facts of the crime itself, you would be asked to

do an impossible thing, and that would be to predict.

A: Yes, sir."

At this point, the prosecutor challenged this venireman for cause on the basis that he had a bias or prejudice against the law because no matter what the evidence in the case would show, he could not "under any circumstances vote yes based on the facts of the crime itself, and the defendant's conduct in that crime." Defense counsel did not question the venireman; however, he did object on the following grounds:

"... I, of course, would object to excusing this juror for cause by what's been demonstrated had [sic] by this record, Your Honor. No question the law would permit a juror to answer Question 2 based solely on the facts of the case, but there is no requirement that he ever do so. He has conceded that he could answer both of those questions yes if he were convinced beyond a reasonable doubt. So I would object to excusing him for cause on what's been communicated by the present record. And I have no questions. I really don't see what I could ask him.

\* \* \* \* \* \*

I agree that the record clearly demonstrates that this juror has clearly stated that under no circumstances that he can envision would he ever answer Question 2 yes based solely on the facts of the case. I recognize that the law would permit him to do that, would permit him to answer yes based solely on the facts of the case, but I would object to excusing the juror because he would refuse to do that which the law would permit him to do, but does not require him to do. That's my objection."

The State's challenge for cause was granted and the venireman was excused.

The prosecutor challenged venireman Bradley on the basis that he harbored a bias or prejudice against some aspect of the law upon which the State is entitled to rely. See Article 35.16(b)(3), V.A.C.C.P. The purported bias or prejudice is that Bradley felt he could never answer special issue number two affirmatively based solely on the facts of the capital offense itself. There is, of course, abundant case law to the effect that the facts of a capital crime, if "severe enough," will *support* a jury verdict of "yes" to the second special issue.[3] However, none of the cases *requires* a particular jury, or an individual juror, to answer the second special issue affirmatively solely on the facts of that particular offense.

Many of the cases relied upon by the State speak of the sufficiency of the evidence to support the jury's affirmative answer to special issue number two.[4] This is an appellate standard of review, a minimum "threshold" below which a jury cannot rationally return an affirmative answer to a level of confidence beyond a reasonable doubt. *Burns v. State*, 761 S.W.2d 353, at 355–56 (Tex.Cr.App.1988). However, that the law permits jurors to find future dangerousness in some cases on the facts of the offense alone does not mean that *all* jurors must do so, or even consider doing so. A particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to answer the second special issue affirmatively. There is nothing unlawful about that; in fact, quite the opposite. As the trial judge himself explained to Bradley early in his voir dire, an individual juror must determine what proof beyond a reasonable doubt means to him, for the law does not tell him:

"... But there is one expression, a very important expression in the trial that I cannot define for you, and I will not define. And that is because we don't have a definition in Texas. And that is

---

3. See, e.g., *Burns v. State*, 761 S.W.2d 353 (Tex. Cr.App.1988); *Bell v. State*, 724 S.W.2d 780, 803 (Tex.Cr.App.1986); *Landry v. State*, 706 S.W.2d 105, 113 (Tex.Cr.App.1985); *Muniz v. State*, 573 S.W.2d 792, 794 (Tex.Cr.App.1978).

4. See, e.g., *Fierro v. State*, 706 S.W.2d 310, 319 (Tex.Cr.App.1986); *Kunkle v. State*, 771 S.W.2d 435, 449 (Tex.Cr.App.1986); *Holloway v. State*, 691 S.W.2d 608, 617 (Tex.Cr.App.1984); *O'Bryan v. State*, 591 S.W.2d 464, 480 (Tex.Cr.App.1979).

the expression beyond a reasonable doubt. You may wonder, well, if you don't tell me what it means, ultimately then how will I know. Well, you're the only one who can tell yourself what beyond a reasonable doubt means to you. Because each one of you 12 jurors will be under oath, required to render a true verdict based on the facts of this case and on the law. And therefore, since you're the one who's under oath, it is you who must establish your own definition of what beyond a reasonable doubt is. You say to me, beyond a reasonable doubt means this. And that's your definition.

\*　\*　\*　\*　\*　\*

And as long as your definition is satisfied, then you follow your definition. So I will never give you a definition for beyond a reasonable doubt. The attorneys probably will. Either in a few minutes when they start questioning you, or in their jury argument. But let me remind you, Mr. Bradley, those are not legal definitions. They are the definitions of the individual attorneys who are giving them to you. And I assure you that if we had 50 lawyers here in this courtroom, each one would have a different definition for beyond a reasonable doubt, and they would all be right in the mind of each of the attorneys. But they're not legal definitions. So their definitions don't count. The only one that counts is your own definition."

That an individual venireman would set his threshold of reasonable doubt higher than the minimum required to sustain a jury verdict does not indicate he has a bias or prejudice against the law.

■ We are not unmindful of the holding in *Marras v. State*, 741 S.W.2d 395 (Tex.Cr.App.1987). There the State was granted a challenge for cause against a venireman who stated that he would have to vote no to future dangerousness if the only evidence he had was the offense for which the appellant had been convicted. However, the venireman did state that he could follow the law and if he was convinced beyond a reasonable doubt, he could answer both special issues affirmatively. Because of his persistence in stating that he could not answer special issue number two based solely on the offense before the jury, this Court held that "he had a bias against the law upon which the State was entitled to rely," and "his beliefs would have substantially impaired the performance of his duties as a juror in accordance with his instructions and his oath." *Marras*, 741 S.W.2d at 402–403. The Court, in announcing its holding, did not indicate which law the venireman was biased against. By citing *Hawkins v. State*, 660 S.W.2d 65, 82 (Tex.Cr.App.1983) and *Muniz*, 573 S.W.2d at 795, immediately after its holding, it would appear that the Court assumed that the appellate standard for determining sufficiency of the evidence applies to individual veniremen.[5] But both *Hawkins* and *Muniz* dealt with sufficiency of the evidence to support a jury's affirmative finding to special issue number two. They do not control the question whether an individual venireman who indicates he would set his reasonable doubt threshold higher than the legal minimum has evinced, without more, a bias or prejudice against the law upon which the state was entitled to rely. For the reasons given we hold that a venireman is not subject to challenge for cause merely because he indicates he would require more evidence than the legal minimum in order to answer special issue two affirmatively. To the extent it conflicts with this holding, *Marras* is overruled.

---

**5.** We also note the *Marras* opinion relied on *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) in stating that the venireman's beliefs would substantially impair the performance of his duties as a juror. However, both *Adams* and *Witt* speak of whether a venireman has conscientious scruples against the death penalty which would substantially impair a venireman's ability to perform his duties. Venireman Bradley affirmatively stated he had no such scruples. Therefore, except to the extent they stand for the proposition that *any* bias against the law sufficient to render a venireman "substantially impaired" will justify a State's challenge for cause, those cases are inapposite.

■ If it did not want Bradley to serve on the jury, the State was required to exercise a peremptory challenge against him. Error in granting a State's challenge for cause in a capital case is reversible notwithstanding that the State may have had peremptory challenges remaining at the conclusion of voir dire. *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1981); *Bell v. State,* 724 S.W.2d 780 (Tex.Cr.App.1986). Accordingly, the judgment is reversed and the cause is remanded to the trial court for a new trial.

McCORMICK, Judge, dissenting.

I join Judge Campbell's well written dissent but write separately to expose a further flaw in the majority's reasoning.

There is no question in my mind that the majority is correct in its assertion that, "... [n]one of the cases *requires* a particular jury, or an individual juror, to answer the second special issue affirmatively solely on the facts of that particular offense." But as the majority also notes, the law clearly permits it.

Under the majority's rationale, no juror would ever be subject to a challenge for cause since no juror is ever required to render a particular verdict based on a given law. For example, no juror is required to grant probation in a given case, but if he cannot consider the full range of punishment, and if probation is available, he is unfit to sit on the panel. *Hernandez v. State,* 643 S.W.2d 397 (Tex.Cr.App.1983).

Similarly, no juror is required to convict upon the testimony of a single eyewitness, or upon the testimony of a child, or upon the testimony of a corroborated accomplice witness, or upon circumstantial evidence, but if a venireman states that he would never even consider a conviction based upon such testimony, then he has a bias against the law upon which the State is entitled to rely and is subject to challenge for cause.

To such a departure from established precedent, I vigorously dissent.

CAMPBELL, Judge, dissenting.

The question presented is whether we shall now overrule a holding in *Marras v. State,* 741 S.W.2d 395 (Tex.Cr.App.1987)—a holding to which there was no dissent—and *re*interpret Article 35.16(b)(3) to mean that a venireperson is *not* challengeable for cause by the State even though the venireperson indicates he could never, under any circumstances, answer "yes" to the second punishment issue based solely upon the evidence of the capital offense. Because the majority's answer to that question subverts the doctrine of *stare decisis,* creates the potential for absurd situations, and effectively overrules not only the *Marras* holding but parallel holdings in several other cases, I must respectfully dissent.

*Stare Decisis and the Rule of Law*

Article 35.16(b)(3) provides broadly that "[a] challenge for cause may be made by the State [if a venireperson] has a bias or prejudice against *any phase of the law upon which the State is entitled to rely for* conviction or *punishment.*" (Emphasis added.) In *Marras,* 741 S.W.2d at 401–403, we interpreted that statute in what we thought was a commonsense manner to allow the State to challenge a venireperson for cause if the venireperson indicated "that he could not answer yes to the second special issue based solely upon the evidence of the capital offense." [1] As is apparent from the *Marras* opinion, we interpreted the statute as we did because of the longstanding principle that the facts of a capital crime, if severe enough, are sufficient to support a jury's affirmative answer to the punishment issue on future dangerousness. See, e.g., *Hawkins v. State,* 660 S.W.2d 65, 82 (Tex.Cr.App.1983); *Muniz v. State,* 573 S.W.2d 792, 795 (Tex.Cr.App.1978). Our interpretation was guided by our belief that the statute's broad language was in-

---

1. See also *McCoy v. State,* 713 S.W.2d 940, 954 (Tex.Cr.App.1986), a capital murder case which presaged the *Marras* decision. In *McCoy,* Judge MILLER, writing for the Court, noted that "the State may have been entitled to ... a challenge for cause under Article 35.16(b)(3)" when a venireperson indicated that he "would require more proof than that of the offense in order to respond affirmatively to the special issues."

tended to allow, in the capital murder context, for the selection of jurors who would not pose insurmountable barriers to the assessment of the death penalty for capital murder. It seemed to us that in the context of capital murder prosecutions, the statute guaranteed that society, acting through its officials, would have a fair opportunity to exact the ultimate punishment for the ultimate crime. To interpret the statute otherwise would allow for paradoxical situations in which, before a capital trial even started, the State would know it was absolutely precluded from obtaining the death penalty. This is especially evident in cases in which the State is seeking an affirmative answer to the second punishment issue armed with nothing more than the heinousness of the crime. See, e.g., *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr. App.1979).

The situation presented in *Marras* was factually and legally identical to the situation presented in the case at bar. Thus, our opinion in *Marras* is, by traditional standards, controlling precedent. Why, then, do we not follow that precedent?

The traditional rule requiring respect for precedent, usually referred to as the rule of *stare decisis* ("let the prior decision stand"), has at least four rationales. First, if courts adhere to past decisions, direction is provided to all who labor in the legal enterprise. Lower courts know how they should and should not decide cases; lawyers know how to frame their arguments, devise their strategies, and advise their clients in accord with the lessons of past cases; the Legislature and Governor know what they may and may not do, and so forth. *"[S]tare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right." *Burnet v. Coronado Oil and Gas Co.*, 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting). Second, the labor of judges would be increased to the breaking point if every past decision could be reopened in every case. Third, "the very concept of the rule of law ... requires such continuity over time that a respect for precedent is, by definition, in-

dispensable." *Planned Parenthood v. Casey*, —— U.S. ——, ——, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992). Fourth, the continuity of the law helps preserve public faith in the judiciary as a source of impersonal and reasoned judgments.

Of course, as every first-year law student knows, the rule of *stare decisis* is not an inexorable command. Courts must be free, at certain times, to overrule their past decisions. But we have recognized that the rule of *stare decisis* "creates a strong presumption in favor of established law." *Collier v. Poe*, 732 S.W.2d 332, 345 (Tex.Cr. App.1987). We have also recognized that the rule "has its greatest force in the area of statutory construction," *id.*, because if the construction of a statute is unacceptable to the Legislature, a simple remedy is available by the process of legislative amendment. *State v. Hall*, 829 S.W.2d 184, 187 (Tex.Cr.App.1992); *Lockhart v. State*, 200 S.W.2d 164, 167–168 (Tex.Cr. App.1947); accord, *James v. Vernon Calhoun Packing Co.*, 498 S.W.2d 160, 162 (Tex.1973); *Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 186 (Tex.1968); *Moss v. Gibbs*, 370 S.W.2d 452, 458 (Tex.1963). In agreement with this position, the United States Supreme Court recently stated:

> [T]he burden borne by the party advocating the abandonment of an established precedent is greater where the Court is asked to overrule a point of statutory construction. Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done.

*Patterson v. McLean Credit Union*, 491 U.S. 164, 171, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989).

When may a precedent be properly overruled? This is a difficult question to answer, but we may be confident in the assumption that a precedent may *not* properly be overruled simply because a majority of the Court believes it to be error. If the rule were otherwise, then no precedent would be safe and our law could change

after every change in Court personnel. "The situation would ... be intolerable if the [periodic] changes in the composition of the court were accompanied by changes in its rulings. In such circumstances there is nothing to do except to stand by the errors of our brethren of the [time] before, whether we relish them or not." B. Cardozo, *The Nature of the Judicial Process* 150 (1921).

In my view, when a court contemplates overruling an established precedent, especially a prior statutory interpretation which has been left undisturbed by the Legislature, the court must carefully balance the reasons proffered for rejecting the precedent against the very weighty considerations—discussed previously—underlying *stare decisis.* Such an analysis will preclude rejection of precedent absent the strongest reasons for doing so.

This case, like *Marras,* is a case of statutory interpretation. The rule of *stare decisis,* therefore, has special force. Nevertheless, the majority fails even to mention *stare decisis* and gives no justification for overruling the *Marras* Court's interpretation of Article 35.16(b)(3) except to claim that that interpretation is erroneous. Significantly, the majority does *not* claim that our prior interpretation has become unworkable or has otherwise led to injustice.

### Effective Overruling of Parallel Cases

As noted previously, in *Marras* we interpreted the phrase "any phase of the law" in Article 35.16(b)(3) to include the principle that the facts of a capital offense, if severe enough, are sufficient to support a jury's affirmative answer to the punishment issue on future dangerousness. Remarkably, the majority today dismisses that principle of law as merely an "appellate standard of review" and proceeds to hold that, under Article 35.16(b)(3), "a venireman is not subject to challenge for cause merely because he indicates he would [always] require more evidence than the legal minimum in order to answer special issue two affirmatively." Op. at 860. What the majority fails to explain, however—whether by accident or design, I cannot say—is that the logic of its holding will lead ineluctably to

the overruling of several precedents other than *Marras.* This is not idle speculation; rather, it is hard reality.

I need only explicate four recent holdings that are flatly incompatible with the majority's holding today. (1) In *Fuller v. State,* 829 S.W.2d 191, 199–201 (Tex.Cr.App.1992), we held, after a long discussion, that under Article 35.16(b)(3), the State may challenge a venireperson for cause if the venireperson indicates he could never answer punishment issue two "yes" unless the defendant was a serial killer. We explained that jurors "may not wholly refuse, before hearing any evidence, to consider an accused for the death penalty unless he has been convicted of murder before." In other words, in *Fuller* we held that a venireperson *is* challengeable for cause *if he indicates he would require more than the legal minimum in order to answer punishment issue two affirmatively.* How the majority intends to square today's holding with *Fuller* is beyond my understanding.

(2) In *Caldwell v. State,* 818 S.W.2d 790, 797 (Tex.Cr.App.1991), we held that a venireperson was challengeable for cause under Article 35.16(b)(3) if he indicated he could never find the defendant guilty based only on the testimony of one witness. We explained that "the venireperson was properly challengeable for cause since he would have held the State to a higher burden of proof than that required by law." Stated differently, the venireperson was challengeable because *he indicated he would require more than the legal minimum in order to make a finding of guilt.*

(3) In *Barnard v. State,* 730 S.W.2d 703, 712–714 (Tex.Cr.App.1987), we held a venireperson challengeable under Article 35.16(b)(3) because he indicated he could never find a defendant guilty based only on circumstantial evidence. That is, again, the venireperson was challengeable because *he indicated he would require more than the legal minimum in order to make a finding of guilt.*

(4) In *Phillips v. State,* 701 S.W.2d 875, 883–884 (Tex.Cr.App.1985), we held a venireperson challengeable under Article 35.-

16(b)(3) because he indicated he could never answer punishment issue two affirmatively if the defendant was a non-triggerman. In other words, again, the venireperson was challengeable because *he indicated he would require more than the legal minimum in order to answer punishment issue two affirmatively.*

All these holdings—and no doubt there are others just like them lurking in the recesses of the digest—are flatly inconsistent with the majority's holding today. If the majority insists upon detouring around these sound precedents interpreting Article 35.16(b)(3), they should do so with their eyes wide open. I, for one, will not be going along.

I respectfully dissent.

McCORMICK and WHITE, JJ., join.