COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

                                                                              )     

LEE ROY BROWN,                                             )                    No. 
08-01-00120-CR

                                                                              )

Appellant,                          )                             Appeal from

                                                                              )     

v.                                                                           )                      283rd District Court

                                                                              )

THE STATE OF TEXAS,                                     )                 of Dallas County, Texas

                                                                              )

Appellee.                           )                     (TC# F-0100206-QT)

 

O
P I N I O N

 

Lee
Roy Brown appeals his conviction for the offense of capital murder.  Upon the jury=s
finding of guilt, the trial court assessed mandatory punishment at life
imprisonment in the Institutional Division of the Texas Department of Criminal
Justice.  We affirm.

FACTUAL SUMMARY








On
April 13, 2000, Duncanville police officers and firefighters were dispatched to
a house fire.  When firefighters
discovered a body in the home, an arson investigator, S.D. Crawford, was
dispatched to the scene.  Another officer
informed Crawford that a sexual assault report had been filed a few days
earlier by Shawanna Bell who resided in the home.  Crawford determined from his observations
both inside and outside of the home that the fire had started in the bedroom
where firefighters found the body. 
Further, he found that the fire had started on or near the victim=s body. 
The presence of coat hangers and ashes around the body indicated that
clothing had been piled on the victim and then set on fire.  Crawford found it significant that the body
was face up with her legs spread apart and her hands over her shoulders.  Generally, when people die in fires, they are
found in the fetal position because they have tried to protect themselves from
the fire.  Subsequent investigation
revealed that the body in the home was that of Bell.  Bell lived in the home with her two children,
Martavia and Rickie.

Five
days before the fire, Bell made a sexual assault report against a man she knew
only as Lee.  A Duncanville police
officer took the report at 5:20 a.m. on April 8, 2000.  Bell worked as a dancer at Club Babay, an
exotic dance club.  Bell had met Lee at
work the prior evening and he had given her a ride home.  She invited him inside and he assaulted her as
they sat on her bed.  Bell refused to go
to the hospital for a sexual assault exam and she would not give a written
statement.  The police officer told Bell
that she would make a report.  








Michael
Peace is a friend and co-worker of Appellant. 
The two men sold cars at Crest Auto Group.  On April 7, 2000, they went out to an exotic
dance club to celebrate an award given to Appellant.  After the club closed, Appellant talked with
Bell for a while.  He obtained permission
from her mother, Loretta Wesley, who worked at the club as the strippers= Ahouse
mom,@ for her
to accompany him and his friends to breakfast. 
Appellant left his business card with Bell=s
mother.  Appellant dropped off Peace and
the other friends at Peace=s
apartment in North Dallas, and then left to take Bell to her home in
Duncanville.  Some time around 5 a.m.,
Appellant called Peace to come over to Bell=s
home.  Peace told Appellant he was too
tired and hung up.  Approximately an hour
later, the telephone rang again.  Peace
noticed that the call came from Bell=s
telephone.  The female caller told Peace
that she did not know who his friend was, but he had raped her.  Peace told the caller to quit joking but she
told him she was serious.  A few minutes
later, the phone rang again.  When Peace
saw that it was from the same number, he didn=t
answer.  The victim left a message
stating again that Peace=s
friend had raped her and she had called the police to report it.  Peace later relayed this information to
Appellant and asked him what had happened. 
Appellant denied Bell=s
allegation and said it was unnecessary to rape her.  Later that same day, Appellant told Peace he
had taken care of it.

In
addition to reporting the sexual assault to the Duncanville police, Bell told
one of her friends, Andrea Ferguson, that Appellant had raped her.  Bell told Ferguson that Appellant had been
harassing her and offering her a monthly payment of $2,000 if she would drop
the charges.  Appellant insisted that
there be a contract so Bell asked Ferguson to help her draw it up.  In a conversation on the evening before the
murder, Bell told Ferguson that she had decided not to take the money.








Bell
also reported the assault to her mother. 
On Sunday, April 9, 2000, Bell told Wesley that Appellant Acame over there and did his thing to me@ and thought he was going to get away
with it.  Although Bell did not state it
outright, Wesley understood that Appellant had sexually assaulted Bell.  She asked Wesley for Appellant=s business card so she could press
charges against him.  The following day,
Wesley again talked to Bell about Appellant. 
Bell stated that Martavia had given Appellant her phone number[1]
and he had been calling her all day. 
Appellant had offered to pay Bell $2,000 per month if she would drop the
charges.  On Wednesday, April 12, 2000,
Bell told Wesley that Appellant was going to stop by her home the following
morning at 8 a.m. with a contract agreeing to pay her $2,000 per month for the
rest of her life.  Bell said that she was
going to refuse the offer and tell Appellant she would not drop the
charges.  When Wesley learned of her
daughter=s death,
she gave the police Appellant=s
name and telephone number.

Dr.
Lynn Salzberger, a medical examiner, performed an autopsy on Bell=s body. 
Although the outer portion of the body was charred, the internal
examination revealed bruises on the muscles in the front and back of the neck
as well as a hemorrhage in the back of the throat or pharynx.  Additionally, the horseshoe-shaped bone over
the voice box was broken and there were additional hemorrhages in the soft
tissues in the front and back of the neck. 
These injuries were consistent with manual strangulation although Dr.
Salzberger could not rule out that some object had been used to compress her
neck.  Dr. Salzberger found soot in the
windpipe indicating that Bell took at least one breath after the fire had
started burning.  She believed Bell had
taken only one or two breaths after the fire began burning.  Dr. Salzberger also found some kind of
synthetic fabric around Bell=s
neck.  She could not say whether it was a
scarf, stocking, a ligature, or even part of her blouse.  








Appellant
testified in his own defense.  He is
married and has two children, a seven-year-old son and three-year-old
daughter.  Prior to being arrested for
this offense, Appellant was employed as a sales consultant at Crest Auto Group
in Dallas.  On April 7, 2000, his sales
manager told him he had received the salesman of the month award.  Appellant and three co-workers, including
Michael Peace, decided to celebrate his success that evening.  After meeting at Peace=s
apartment, they decided to go to Babay=s.  Of the four men, only Peace had previously
been to this club.  They sat on some
stools right in front of the stage.  When
Bell left the stage, Appellant assisted her in walking down the stairs from the
stage since she had on high-heeled shoes. 
After changing clothes, Bell came back and initiated a conversation with
Appellant.  She sat down for a few
minutes and had a drink with him and his companions.  Bell told Appellant, who is 6= 6@
and weighs 275 pounds, that he was a Abig
guy@ and attractive and she asked whether
he played professional basketball.  They
talked for a while about what kind of work he and his friends did.  At some point, Appellant gave Bell one of his
business cards.  Near the end of the
evening, Bell asked Appellant to wait for her after the club closed because she
wanted to talk to him outside.  

Appellant
and his friends waited in the parking lot until Bell came outside.  Appellant and Bell walked over to her mother=s car so that he could be
introduced.  Appellant gave Wesley one of
his business cards as a means of introducing himself and to solicit her
business.  Bell then left with Appellant
and the others.  They had planned to go
to breakfast but decided to go to Peace=s
apartment first so that everyone could get their own car.  At the apartment, Appellant went inside to
use the restroom.  Once at the apartment,
Appellant realized Peace was too intoxicated to drive.  Peace stayed at his apartment and the other
friends drove home.  Appellant told Peace
that he would call him later to make sure he had not decided to drive to his
girlfriend=s home in
Duncanville.  Appellant and Bell left the
apartment at approximately 2:45 a.m.  








Appellant
and Bell wanted to get something to eat but could not find any open restaurants
so they went to the drive-thru at Whataburger. 
Once at Bell=s home,
they went directly to her bedroom with the food.  Bell told Appellant to have a seat on the
bed.  Bell, who was still dressed in one
of her outfits from the club, went into the bathroom and removed the
outfit.  She asked Appellant to get her
robe from the closet.  Bell, clothed only
in the robe, came out of the bathroom and sat on the bed with Appellant.  They talked for a few minutes while Bell
ate.  Bell loosened her robe in order to
expose her body and then began dancing for Appellant.  Appellant permitted Bell to reach into his
pants and manually stimulate him, but he refused to engage in sexual
intercourse with her.  Bell became
extremely angry when Appellant rebuffed her advances, so he attempted to calm
her down by talking with her.  Appellant
was so successful in calming Bell that she gave him her telephone number.  Before leaving Bell=s
home, Appellant called Michael Peace to make sure he was still home and had not
attempted to drive while intoxicated. 
Peace asked Appellant whether he had slept with Bell and Appellant
replied that he had not.  Appellant knew
when he left that Bell was still angry with him.  He believed she only wanted to get money from
him.   

Later
that same day, Peace told Appellant that Bell had called his apartment looking
for Appellant.  Peace gave Bell the
telephone number at the dealership.  Bell
called Appellant at the dealership on Sunday. 
Bell no longer seemed to be angry and they talked for a while.  He attempted to get her mother=s telephone number so that he could
sell her a car but Bell would not give him the number.  They ended the conversation because Appellant
had to get back to work.  Bell called
Appellant at work on Monday and at her invitation, Appellant stopped by the
club after work and had a drink with her. 
Bell did not tell Appellant that she had filed a sexual assault report
against him.  

On
Wednesday, April 12, Bell called Appellant and told him that she had filed a
complaint against him with the police. 
Bell demanded that Appellant pay her $500 in order for her to drop the
charges.  When Appellant expressed his
disbelief, she gave him an incident number and a telephone number of the police
department.  He called the number and
verified that a sexual assault report had been filed on Saturday, April 8.  Appellant called Bell to tell her he would
pay the money but she raised the price to $1,000, and later that same
afternoon, she again raised her demand to $2,000 per month for life.  She also insisted that he sign a
contract.  After talking for a while,
they agreed that Appellant would pay her a single payment of $2,000 the
following morning at 8 o=clock.  Appellant agreed to pay Bell in order to save
his reputation and his marriage.  








The
following morning, Appellant went to Bell=s
home to pay her the $2,000.  Appellant had
an additional $1,000 with him because he had just cashed a check.  Bell=s
son, Rickie, answered the door and let Appellant in the house.  Although Appellant did not sound angry,
Rickie knew something was wrong because of the way Appellant looked at
Bell.  Bell invited Appellant in to her
bedroom and asked him to take a seat. 
After making sure the children had left for school, Bell returned to the
bedroom.  Appellant counted out $2,000
(twenty $100 bills) and asked Bell for the contract because that was her Aend of the bargain.@ 
According to Appellant, the contract would have provided that he was
making a one time payment of $2,000 in exchange for Bell=s
agreement to drop the sexual assault charge. 
Bell explained that she did not have a contract.  As Appellant attempted to put away the other
$1,000 in his pocket, Bell grabbed it away from him, stating Athis would do to start.@ 
Appellant asked what had happened to their deal and Bell informed him
that she was changing the agreement.  In
response, Appellant took the money away from Bell which enraged her.  She pulled a knife and swung it twice at
Appellant.  Appellant knocked the knife
out of her hand but Bell attacked him anyway. 
When she grabbed Appellant=s
tie, he put his hands on her neck to defend himself but he did not squeeze her
neck or choke her.  Bell continued to
kick and swing at Appellant and, at one point, she grabbed Appellant=s tie. 
During this struggle, Bell pulled Appellant onto the bed.  They rolled over twice on the bed and then
fell to the floor with Appellant landing on top of her.  Due to the force of the fall, Appellant=s hands compressed Bell=s neck but he denied ever intentionally
choking her.  Seeing that Bell had lost
consciousness, Appellant got up from the floor. 
Believing he had killed Bell, Appellant panicked.  He found a can of gasoline in the garage and
poured it on the floor of the bedroom but did not pour any on Bell=s body. 
Appellant then ignited the gasoline with a match he found on the kitchen
counter and left the home.  








The
trial court instructed the jury on capital murder and the lesser included
offenses of murder, manslaughter, and criminally negligent homicide.  The jury found Appellant guilty of capital
murder as alleged in the indictment.  

SUFFICIENCY OF THE EVIDENCE

In
Points of Error Nos. One and Two, Appellant challenges the legal and factual
sufficiency of the evidence to support his conviction.  First, he argues that he did not commit or
attempt to commit the offense of retaliation, and therefore, the evidence is
insufficient to show that he committed murder in the course of committing
retaliation.  Second, he alleges that the
evidence is insufficient to prove that he intentionally caused Bell=s death.








In
reviewing the legal sufficiency of the evidence to support a criminal
conviction, we must review all the evidence, both State and defense, in the
light most favorable to the verdict to determine whether any rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt. Jackson v. Virginia, 443 U.S. 307, 318‑19, 99 S.Ct. 2781,
2789, 61 L.Ed.2d 560, 573 (1979); Geesa v. State, 820 S.W.2d 154, 159
(Tex.Crim.App. 1991).  This familiar
standard gives full play to the responsibility of the trier of fact fairly to
resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic to ultimate facts.  Jackson, 443 U.S. at 319, 99 S.Ct. at
2789, 61 L.Ed.2d at 573.  We do not
resolve any conflict of fact or assign credibility to the witnesses, as it was
the function of the trier of fact to do so. 
See Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson
v. State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991).  Instead, our duty is only to determine if
both the explicit and implicit findings of the trier of fact are rational by
viewing all of the evidence admitted at trial in a light most favorable to the
verdict.  Adelman, 828 S.W.2d at
422.  In so doing, any inconsistencies in
the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.   Further, the standard of review is the same
for both direct evidence and circumstantial evidence cases.  Geesa, 820 S.W.2d at 158.

When
conducting a review of the factual sufficiency of the evidence, we consider all
of the evidence, but we do not view it in the light most favorable to the
verdict.  Clewis v. State, 922
S.W.2d 126, 129 (Tex.Crim.App. 1996); Levario v. State, 964 S.W.2d 290,
295 (Tex.App.‑‑El Paso 1997, no pet.).  We review the evidence weighed by the jury
that tends to prove the existence of the elemental fact in dispute and compare
it with the evidence that tends to disprove that fact.  Johnson v. State, 23 S.W.3d 1, 7
(Tex.Crim.App. 2000); Jones v. State, 944 S.W.2d 642, 647 (Tex.Crim.App.
1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54
(1997).  A defendant challenging the
factual sufficiency of the evidence may allege that the evidence is so weak as
to be clearly wrong and manifestly unjust, or in a case where the defendant has
offered contrary evidence, he may argue that the finding of guilt is against
the great weight and preponderance of the evidence.  See Johnson, 23 S.W.3d at 11.  Although we are authorized to set aside the
fact finder=s
determination under either of these two circumstances, our review must employ
appropriate deference and should not intrude upon the fact finder=s role as the sole judge of the weight
and credibility given to any evidence presented at trial.  See Johnson, 23 S.W.3d at 7. We are
not free to reweigh the evidence and set aside a verdict merely because we feel
that a different result is more reasonable. 
Cain v. State, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997); Clewis,
922 S.W.2d at 135.

Elements of Capital Murder








For
purposes of this case, a person commits capital murder if he commits murder as
defined under Section 19.02(b)(1) and the person intentionally commits the
murder in the course of committing or attempting to commit retaliation.  Tex.Pen.Code
Ann. '
19.03(a)(2)(Vernon 1994).  Under Section
36.06, a person commits retaliation if he intentionally or knowingly harms or
threatens to harm another by an unlawful act:

(1)  in retaliation for or on account of the
service or status of another as a:

(A)  public servant, witness, prospective witness,
or informant; or

(B)  person who has reported or who the actor
knows intends to report the occurrence of a crime; or

 

(2)  to prevent or delay the service of another as
a:

(A)  public servant,
witness, prospective witness, or informant; or

(B)  person who has reported or who the actor
knows intends to report the occurrence of a crime.

 

Tex.Pen.Code Ann. ' 36.06 (Vernon Supp. 2002).  The indictment alleged that Appellant did
unlawfully then and there:

[I]ntentionally
cause the death of SHAWANNA BELL, an individual, by strangling and compressing
the neck of SHAWANNA BELL with an object, a deadly weapon, the exact nature of
which is unknown to the Grand Jurors, and the defendant did intentionally cause
the death of SHAWANNA BELL by smoke inhalation and thermal injuries by using
fire, a deadly weapon, on and near the body of SHAWANNA BELL, and the defendant
intentionally did cause the death of SHAWANNA BELL while the said defendant was
in the course of committing and attempting to commit the offense of
retaliation.

 

The application
paragraph of the jury charge properly applied the law to the facts.  

Retaliation








Citing
Garrett v. State, 851 S.W.2d 853 (Tex.Crim.App. 1993), Appellant
contends that he did not form the intent to commit retaliation either prior to
or concurrent with the commission of murder. 
The Penal Code does not define the phrase Ain
the course of committing or attempting to commit@
as used in Section 19.03(a)(2).  The
Court of Criminal Appeals has defined the phrase to mean Aconduct occurring in an attempt to
commit, during the commission, or in the immediate flight after the attempt or
commission of the offense.@  Garrett, 851 S.W.2d at 856; Riles
v. State, 595 S.W.2d 858, 862 (Tex.Crim.App. 1980).  In Garrett, the court determined that
in order for murder during a robbery to qualify as capital murder, the intent
must be formed prior to or concurrent with the murder.  Garrett,  851 S.W.2d at 856.  The court reached this conclusion because the
point at which the defendant formulated his intent to take the victim=s property is critical to
differentiating, in the abstract, between the defendant=s
commission of capital murder in the course of committing robbery and his
commission of first‑degree murder, followed by theft from a corpse, a
third‑degree felony.  See White
v. State, 779 S.W.2d 809, 815 (Tex.Crim.App. 1989), cert. denied,
495 U.S. 962, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). 

Intent
is a fact question for the trier of fact, and it may be inferred from the acts,
words, and conduct of the accused.  Manrique
v. State, 994 S.W.2d 640, 649 (Tex.Crim.App. 1999); Wallace v. State,
52 S.W.3d 231, 234-35 (Tex.App.‑-El Paso 2001, no pet.).  As a result of its nature, mental culpability
must generally be inferred from the circumstances under which a prohibited act
or omission occurs.  Robles v. State,
664 S.W.2d 91, 94 (Tex.Crim.App. 1984); Wallace, 52 S.W.3d at 235.








Appellant
knew Bell had filed a sexual assault report against him.  Although there is conflicting evidence as to
which party initiated the idea of a monetary payment, it is undisputed that
Appellant so desperately wanted Bell to drop the charges and thereby save his
reputation and marriage, he was willing to pay her $2,000 in order to obtain
her agreement to do so.  Appellant
admitted that he went to Bell=s
home that morning with the express purpose of stopping her from reporting the
sexual assault.  The jury also had before
it evidence that Bell had planned to tell Appellant on the morning of her
murder that she intended to prosecute him for sexual assault.  Given the violent death suffered by Bell, the
jury could have reasonably concluded that Appellant killed her upon hearing
this news.  This evidence is legally
sufficient to show that Appellant formed the intent to commit retaliation prior
to or concurrent with the murder.

Viewing
all of the evidence but without the prism of the light most favorable to the
verdict, there are several conflicts between Appellant=s
version of what occurred and the testimony of other witnesses and the physical
evidence.  Important to this particular
issue, there is some evidence which shows that Bell may have told Appellant she
would not drop the charges at all and other evidence that she upped the ante and
demanded additional money before she would drop the charges.  Regardless of which scenario is true, the
jury could have reasonably rejected Appellant=s
claims of Aself
defense@ or accidental
death and found that he killed her because she refused to immediately drop the
charges.  Such a conclusion is not
contrary to the overwhelming weight of the evidence.  Therefore, the evidence is factually
sufficient to show that Appellant formed the intent to commit retaliation
either prior to or contemporary with the murder.  

Murder

Appellant
also contends that the evidence is legally and factually insufficient to show
that he intentionally caused Bell=s
death because she died as the result of a Astruggle@ and the State failed to disprove the
alternative reasonable hypotheses.








Reviewing
first the legal sufficiency of the evidence, we do not consider the existence
of alternative reasonable hypotheses in our review of the evidence.  The Court of Criminal Appeals disavowed this
analytical construct in Geesa v. State, 820 S.W.2d 154, 159
(Tex.Crim.App. 1991).  Appellant admitted
that he placed his hands on the front of Bell=s
neck although he denied intentionally choking her.  The physical evidence, however, shows that
considerable force was applied to both the front and back of her neck to the
degree she suffered bruising of muscles deep within.  Further, the bone covering the larynx was
broken.  From this, the medical examiner
formed the expert opinion that Bell had been manually strangled by hands or
some other object applied to the neck. 
Other evidence revealed that Bell had been rendered unconscious by the
strangulation and was incapable of defending herself from the fire.  Bell took only one or two breaths after the
fire began and she did not curl up into a protective position.  From this evidence, a rational trier of fact
could have found beyond a reasonable doubt that Appellant intentionally caused
Bell=s death.

In
conducting the factual sufficiency review, the alternative reasonable hypotheses
proposed by Appellant in his brief are relevant to, but not determinative of,
our review.  Wilson v. State, 7
S.W.3d 136, 141 (Tex.Crim.App. 1999). 
Appellant complains that the jury=s
verdict is contrary to the alternative hypothesis that Bell died as the result
of a struggle.  We understand Appellant
to argue that he caused Bell=s
death but did not do so intentionally. 
As noted above, Appellant denied ever choking Bell, but instead claimed
that his hands accidentally compressed her neck when they fell off of the
bed.  Appellant=s
version of the events is directly contradicted by the physical and scientific
evidence.  As further evidence of his
intent, Appellant set the area immediately around Bell on fire.  The jury=s
resolution of these factual issues is not contrary to the overwhelming weight
of the evidence.








Regarding
Appellant=s
argument that he killed Bell in self-defense, Appellant was not entitled to and
the jury did not receive a self-defense instruction.  Therefore, we will not consider this as a
reasonable alternative hypothesis. 
Having found the evidence both legally and factually sufficient to
support the jury=s
verdict, we overrule Points of Error Nos. One and Two.

INEFFECTIVE ASSISTANCE








In
Point of Error No. Three, Appellant alleges he was denied the effective
assistance of counsel at trial.  A
defendant is entitled to Areasonably
effective assistance.@  Strickland v. Washington, 466 U.S.
668, 687, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984); Stafford v. State,
813 S.W.2d 503, 506 (Tex.Crim.App. 1991). 
However, a defendant is not entitled to errorless counsel or counsel
whose competency is judged by hindsight. 
Stafford, 813 S.W.2d at 506; Calderon v. State, 950 S.W.2d
121, 126 (Tex.App.--El Paso 1997, no pet.). 
The proper standard for determining claims of ineffective assistance
under the Sixth Amendment is the two‑step analysis adopted by the United
States Supreme Court in Strickland v. Washington.  See Hernandez v. State, 988 S.W.2d
770, 771‑72 (Tex.Crim.App. 1999). 
Under the first prong, the defendant must show that counsel=s performance was deficient to the
extent that counsel failed to function as the Acounsel@ guaranteed by the Sixth
Amendment.  Jackson v. State, 877
S.W.2d 768, 771 (Tex.Crim.App. 1994). 
The defendant must demonstrate that his attorney=s
representation fell below an objective standard of reasonableness under
prevailing professional norms.  Vasquez
v. State, 830 S.W.2d 948, 949 (Tex.Crim.App. 1992).  Under the second prong, the defendant must
establish that counsel=s
deficient performance prejudiced the defense. 
Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at
693; Jackson, 877 S.W.2d at 771. 
Prejudice is established by a showing that there is a reasonable probability
that but for counsel=s
unprofessional errors, the result of the proceeding would have been
different.  Strickland, 466 U.S.
at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; Jackson, 877 S.W.2d at
771; Hernandez v. State, 726 S.W.2d 53, 55 (Tex.Crim.App. 1986).  A reasonable probability is a probability
sufficient to undermine confidence in the outcome.  Strickland, 466 U.S. at 694, 104 S.Ct.
at 2068, 80 L.Ed.2d at 698; Jackson, 877 S.W.2d at 771.

In
our review of a claim of ineffective assistance of trial counsel, we must
indulge a strong presumption that counsel=s
conduct falls within the wide range of reasonable, professional assistance and
the appellant must overcome the presumption that the challenged conduct can be
considered sound trial strategy.  Jackson,
877 S.W.2d at 771; Calderon, 950 S.W.2d at 126.  Consequently, allegations of ineffectiveness
of counsel must be firmly founded in the record.  Hawkins v. State, 660 S.W.2d 65, 75
(Tex.Crim.App. 1983); Calderon, 950 S.W.2d at 126.  Under the Strickland test, the
appellant bears the burden of proving ineffective assistance by a preponderance
of the evidence. Jackson, 877 S.W.2d at 771; Calderon, 950 S.W.2d
at 126.  In the absence of a record
demonstrating the basis for trial counsel=s
action or inaction, a defendant will rarely be able to rebut the presumption
that counsel=s action
or inaction constituted reasonable trial strategy.  See Thompson v. State, 9 S.W.3d 808,
814 (Tex.Crim.App. 1999).

Failure to Cross-Examine Witnesses/Object








Appellant
generally alleges that his attorneys=
performance is deficient because they failed to cross-examine the State=s witnesses or object.[2]  According to Appellant, their defense
consisted of Ano
objections@ and Ano questions.@  Our review of the record shows that counsel
cross-examined thirteen of the State=s
twenty witnesses.  Appellant does not
explain how the cross-examination should have been conducted differently or
which witnesses should have been cross-examined but were not.  His brief also does not attempt to describe
how he has met the prejudice component of Strickland.  With respect to the failure to object,
Appellant merely states that his attorneys waived all issues related to jury
selection.  Appellant does not identify
what errors occurred but were not preserved or how the Aerrors@ prejudiced his defense.  We are not required to sift through the
record in order to find evidence supporting these generalized complaints
leveled against Appellant=s
attorneys.  Thus, he has failed to carry
his burden under Strickland.

Lack of Investigation and Trial Preparation

Appellant
next criticizes his trial attorneys for putting him on the stand in the face of
a circumstantial evidence case.  Although
Appellant couches this allegation of deficient performance in terms of a lack
of investigation and preparation on the part of his attorneys, the gravamen of
this complaint is a challenge to his attorneys=
decision to have him testify.  Appellant
did not file a motion for new trial alleging ineffective assistance of counsel.[3]  Consequently, the record is silent with
respect to counsels= trial
strategy and Appellant has failed to rebut the presumption that this decision
constituted reasonable trial strategy.  See
Thompson, 9 S.W.3d at 814.   Appellant
further argues that the failure of trial counsel to raise this issue in a
motion for new trial constitutes ineffective assistance.  This argument begs the question of whether
counsel=s
decision to have Appellant testify is reasonable trial strategy.  In the absence of a record showing that it is
not reasonable trial strategy, Appellant=s
arguments fail.

Failure to Request Batson Hearing








 The next allegation involves trial counsels= failure to request a Batson
hearing.[4]  There is nothing to suggest that a Batson
hearing was warranted since the record does not reflect the racial composition
of the jury panel nor does it reveal how the State exercised its peremptory
challenges.  See Heard v. State,
887 S.W.2d 94, 102 (Tex.App.‑-Texarkana 1994, pet. ref=d). 
A Batson hearing is not required simply because Appellant is a
member of a minority racial group. 
Further, even if the record demonstrated that counsels= performance was deficient for failing
to preserve a Batson claim, Appellant must still show that he suffered
prejudice as required by Strickland. 
Batiste v. State, 888 S.W.2d 9, 16-17 (Tex.Crim.App.
1994)(defendant was required to show Aprejudice@ prong of Strickland analysis to
establish that trial counsel was ineffective in failing to preserve alleged Batson
error regarding potential racial discrimination in jury selection).  Appellant has not proven either prong of Strickland.

Failure to Request Self-Defense Instruction

Finally,
Appellant challenges counsels=
failure to request a self-defense instruction. 
Given Appellant=s
admission at trial that nothing prevented him from retreating after he disarmed
Bell, he was not entitled to a self-defense instruction.  A reasonable person would have retreated
without using deadly force.  See
Riddle v. State, 888 S.W.2d 1, 7 (Tex.Crim.App. 1994); Martinez v. State,
775 S.W.2d 645, 647 (Tex.Crim.App. 1989). 
Counsel cannot be faulted for failing to request an instruction to which
Appellant was not entitled.  See
McFarland v. State, 845 S.W.2d 824, 846 (Tex.Crim.App. 1992), cert.
denied, 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993)(counsel does
not have obligation to object to admissible evidence).  Because Appellant has not established either
prong of Strickland by a preponderance of the evidence, we overruled
Point of Error No. Three.  The judgment
of the trial court is affirmed.

 

June 27, 2002

                                                                        


ANN CRAWFORD
McCLURE, Justice

Before Panel No. 2

Barajas, C.J., McClure, and Chew,
JJ.

 

(Do Not Publish)











[1]  Bell=s son testified that Appellant had stopped by the
house a few days before the murder and Martavia had given him the phone
number.  





[2]  Appellant was
represented by two attorneys at trial.  





[3]  The motion for
new trial alleged only that the verdict is contrary to the law and the
evidence.  





[4]  Batson v.
Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).