**Billie Sue STEEN, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 14–00–00429–CR.

Court of Appeals of Texas, Houston (14th Dist.).

March 28, 2002.

David S. Barron, Bryan, for appellant.

Douglas Howell, III, Bryan, for appellee.

Panel consists of Justices HUDSON, FOWLER, and EDELMAN.

## OPINION

WANDA McKEE FOWLER, Justice.

Over a plea of not guilty, a jury convicted appellant of aggravated perjury before a grand jury. Punishment was assessed at ten years confinement in the Texas Department of Criminal Justice, Institutional Division, probated for ten years. As a condition of probation, appellant served 90 days in the Brazos County Jail. In a sole issue for review, appellant argues that the evidence was legally insufficient to support the jury's verdict and the State failed to prove the materiality of her alleged false statement. We affirm the judgment of the trial court.

### THE FACTS

The evidence at trial showed the following. Appellant, a single mother of an eight-year-old child, was having an adulterous affair with a co-worker. In March or April of 1999, the co-worker asked appellant if she was pregnant because he "noticed her stomach was getting big." Appellant replied that she "could be." Upon further questioning, appellant told the co-worker that she was due at the end of May. They did not discuss the pregnancy any further. Appellant either denied or hid her pregnancy from all of her other co-workers.

On April 5, appellant went to see Dr. Alexander Kunjappy, complaining of swollen feet. Among other things, she told Dr. Kunjappy that she was seven months pregnant and she had no complications with her last pregnancy. During the examination, Dr. Kunjappy heard a fetal heartbeat and felt fetal movements. Based on his examination, he determined that the unborn child was healthy. This was the only medical care sought by appellant prior to May 12.

On May 11, appellant did not go to work and called to tell a supervisor that she was ill. The next day, appellant called her immediate supervisor, explaining that she had "overdone it that weekend" and had to be admitted to the hospital to drain some fluid.

On May 12, appellant's family took her to a hospital emergency room. Because she had no doctor of her own, appellant was attended to by the on-call physician, Dr. Steve Braden, who specializes in family medicine. At admission, appellant was bleeding profusely from the vagina and told Dr. Braden she had been bleeding for two days. Dr. Braden testified that appellant appeared to be in shock; *i.e.*, she had a high pulse rate, was weak and pale, had low body temperature, and was very shaky. And even though appellant was in critical condition, Dr. Braden testified that she was coherent, understood him, and was able to carry on a conversation. She told him that she had received no significant pre-natal care, other than the one appointment with Dr. Kunjappy. When questioned by Dr. Braden, she could not say when her last menstrual period was or when the baby was due.

Dr. Braden examined appellant's uterus, and he testified that, from its size, it was consistent with a full-term baby or, perhaps a slightly smaller child. During his examination of appellant, he found no fetal heartbeat. Accordingly, Dr. Braden ordered an Ultrasound. Dr. Braden found no fetus and no fetal parts. But he found that appellant's cervix was completely dilated. Dr. Braden called for the hospital's staff obstetrician.

While waiting for the obstetrician, Dr. Braden became more concerned about appellant's bleeding. He called for a blood test, which showed that her blood count was dangerously low. Dr. Braden testified that, in his eighteen years of practicing medicine, he had never seen a blood level that low before. He concluded that appellant had lost approximately two-thirds of her total blood volume. Appellant's feet had to be raised so that her remaining blood would "profuse" to her major organs. Dr. Braden further testified that in his experience, he had never seen anyone bleed for two-and-half days and fail to seek medical treatment. Dr. Braden had to order four units of blood for appellant.

Obstetrician Dr. Cynthia Jansky, the hospital's on-call obstetrician, arrived to attend to appellant. After consulting with Dr. Braden, she did a short evaluation and found that appellant was suffering from a retained placenta. An Ultrasound showed a placenta and blood clots, but no baby. Dr. Jansky testified that appellant was in shock, had suffered a great deal of blood loss, and that a common cause of postpartum hemorrhage is retained placenta. To stop the bleeding, Dr. Jansky anaesthetized appellant and removed the placenta.

The recovered placenta was eight inches in length. No fetal parts were found in placenta. Dr. Jansky testified that a placenta of such size is consistent with full-term baby who could sustain itself outside the womb. From the size of the placenta, Dr. Jansky concluded that the baby was full-term; that is, it had completed 36–38 weeks of gestation. Specifically, Dr. Jansky said "I was somewhat in shock because the placenta was ... a large placenta, what I normally would see when I delivered a term-size baby." She further testified that as a general rule, where there is a placenta, there is a baby; *i.e.*, they are connected. The placenta provides food and oxygen for the developing baby, and there is not one (either placenta or baby) without the other. Dr. Jansky testified that after delivering the placenta, "We began to wonder immediately where the baby was. There must have been a baby at some point in time."

Dr. Jansky also testified that, normally, a placenta is expelled or removed within 15 minutes of delivery of the baby. When delivering a placenta, Dr. Jansky explained, the timing is crucial. She stated that one has "to know when to pull on the cord, ... you can't do it too hard—otherwise, it can tear the cord and cause a retained placenta." No umbilical cord was found attached to the retained placenta. Dr. Jansky testified that she believed that the umbilical cord was pulled too hard, and as a result, it tore, necessitating manual extraction of the placenta. The prosecutor then asked Dr. Jansky the following question:

> Prosecutor: You had no baby, the umbilical cord was gone, but the placenta was still attached to the uterus?

> Dr. Jansky   Correct.

On cross-examination, Dr. Jansky explained that in cases such as appellant's, when there is such an advanced stage of development, a baby cannot be "reabsorbed" into the uterus. Reabsorption of a baby is common in first trimester miscarriages, but with the indication of advanced fetal development here, appellant's

baby could not have been reabsorbed into her uterus. Dr. Jansky further concluded that a layperson would know whether a full-term baby was passed, either dead or alive. Dr. Jansky explained that there is "simply too much tissue that doesn't look like blood. There are organ systems, skin, nails, bones." And, even if appellant delivered a stillborn child, the baby would come out together, and the stillbirth would be so much bigger than any blood clot that it would be impossible not to notice it. Specifically, Dr. Jansky testified that the bony structure of such a well-developed fetus would be impossible to pass without the mother's knowledge. Even with a stillborn child, she explained, the bony tissue does not dissolve. At that stage of fetal development, there is no soft bony tissue that could be mistaken for blood clots. And, there is too much body tissue to be mistaken for a single, or even several, blood clots. Additionally, the child's head at that stage is usually about four inches in diameter. In Dr. Jansky's opinion, a four-inch head could not be flushed down a toilet.

After appellant had been stabilized, Dr. Jansky went to the waiting area and asked appellant's family if she had delivered a baby at home. All of appellant's family members denied any knowledge of her having a baby. So, once appellant was sufficiently alert, Dr. Jansky asked her about the baby, but appellant flatly denied having a baby. Based on Dr. Jansky's medical knowledge, she did not believe appellant was telling the truth. In her professional opinion, there had been a baby attached to the placenta. Because she was suspicious of appellant's denial, Dr. Jansky called police.

Pediatric pathologist Dr. Edwina Popeck also testified at trial. Her training and practice includes the analysis of childhood diseases and the evaluation of placentas, fetuses, and embryos. From her analysis of the placenta, she concluded unequivocally that the placenta supported a full-term baby. She also found red and white blood cells in the placenta that were of fetal origin. Significantly, Dr. Popeck testified that several hours after a baby is delivered or dies in utero, these cells begin to degenerate. Accordingly, Dr. Popeck concluded that the intact fetal cells suggested "that the baby was alive and associated with this placenta about two-to-five days prior to the placenta being delivered." Dr. Popeck testified that there was no way to tell definitively from the condition of the placenta whether the baby was born alive or dead. However, Dr. Popeck's examination of the placenta detected an infection of the placenta, which led her to conclude that the baby was probably a stillbirth. She opined that there was a twenty-five-percent chance that the baby could have survived the infection and was born alive. She also concluded that even if the baby was stillborn, it could not have dissolved and been reabsorbed into appellant's uterus, and further, the baby could not have been mistaken for a blood clot during passage of the fetus. Dr. Popeck also testified that she found no fetal parts in several feminine pads recovered in the investigation, and if a dead fetus had undergone some degeneration in utero, she would have expected to find pieces of the fetus on the feminine pads.

Detective David Johnson of the Bryan Police Department questioned appellant at the hospital on May 12 and 13. On both occasions, appellant was evasive and nonchalant. At one point, Detective Johnson offered to help her find her baby; she shook her head indicating that she did not want to find it, and ultimately said, "I have peace of mind. I haven't done anything wrong." Detective Johnson testified that during the two interviews, appellant never expressed any concern for her child.

Bryan Police Officer Ron Stautzenberger was also assigned to investigate the baby's disappearance. Appellant had been living with her mother for the past seven years, and with the consent of appellant's mother, he conducted a search of her home.

Appellant's bed had been made, but when Stautzenberger pulled back the bedspread, he found blood stains on the back of it. Underneath the sheet, he found a thin piece of plastic which was covering an area of the bed that had been saturated with blood. The blood spot extended over the edge of the bed and down the side of the mattress. He also noticed another substance on the sheets that appeared to be cleaning fluid. No fetal parts were recovered from appellant's bedding.

Stautzenberger also found blood in the bathroom adjacent to appellant's bedroom. To determine the size of its passageways, Stautzenberger later returned to seize the commode in appellant's bathroom. The largest opening measured two-and-a-quarter inches in diameter.

Despite law enforcement's efforts, no baby was ever found. A grand jury was convened to investigate the case and to determine possible charges against appellant—including some form of homicide or sale of a baby. When the District Attorney asked appellant if she had had a baby, appellant responded under oath before the grand jury that she had not "passed a baby." She testified instead that all she passed were blood clots.

## THE LAW

■ A person commits aggravated perjury if, with intent to deceive and with knowledge of the statement's meaning, he or she makes a false statement under oath in connection with an official proceeding, and the false statement is material. TEX. PEN.CODE ANN. §§ 37.02, 37.03 & 37.04 (Vernon 1994). A statement is material if it could have affected the course or outcome of the official proceeding. TEX. PEN. CODE ANN. § 37.04(a). Testimony that could have affected the course of the proceeding is material when such testimony, if believed by the finder of fact, bears directly on the credibility of the States' witnesses. *Mitchell v. State*, 608 S.W.2d 226, 228 (Tex.Crim.App.1980) (panel op.). Materiality refers to statements having some substantial potential for obstructing justice and excludes utterly trivial falsifications. *Id.* However, the State is not required to prove that a false statement did, in fact, affect the outcome of the hearing. *Terrell v. State*, 801 S.W.2d 544, 548 (Tex.App.— Houston [14th Dist.] 1990, pet. ref'd). Rather, the State need only demonstrate that the false testimony, if believed, could have affected the course or outcome of the proceeding. *Id.* Put another way, a statement is material if the "perjured testimony might deter a grand jury from following one line of inquiry, or if it might encourage the grand jury to follow a rabbit trail." *Ward v. State*, 938 S.W.2d 525, 531 (Tex. App.—Texarkana 1997, pet. ref'd).

## STANDARD OF REVIEW

■ Appellant challenges the legal sufficiency of the evidence to support the verdict against her. When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Garrett v. State*, 851 S.W.2d 853, 857 (Tex.Crim.App.1993). This standard of review applies to cases involving both direct and circumstantial evidence. *King v. State*, 895 S.W.2d 701, 703 (Tex.Crim.App.1995). On appeal, this

court does not reevaluate the weight and credibility of the evidence, but we consider only whether the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex.Crim.App.1993).

### DISCUSSION AND HOLDINGS

Appellant testified that she "did not pass a baby," but the record supports the jury's verdict that this statement was (a) false and (b) material. Therefore, there was ample evidence for the jury to find aggravated perjury.

### (a) Was the evidence sufficient to support the conclusion that the statement was false?

Appellant knew the grand jury was investigating a possible homicide or the sale of her child. In spite of this, there is sufficient evidence to conclude that she refused to tell the truth during the inquiry. The record supports the conclusion that appellant was pregnant, the pregnancy had reached full-term or nearly full-term, the baby was so fully developed that it could not have been reabsorbed into the uterus or passed without her knowledge, and that such a well-developed baby, live or stillborn, could not have been mistaken for one or several blood clots. Moreover, the record reflects that appellant went to great lengths to hide her pregnancy and the subsequent birth—almost to the point of death. *See King v. State*, 895 S.W.2d at 703. From these facts, the jury could have inferred that her statement was made with the intent to deceive. Therefore, we conclude that the record supports the jury's conclusion that the statement, "I did not pass a baby" was a false statement, made with intent to deceive and with knowledge of its meaning. *See Terrell*, 801 S.W.2d at 547.

### (b) Was the statement material?

"Whether a statement is material in a given factual situation is a question of law." TEX. PEN.CODE ANN. § 37.04. Because appellant's statement, if it had been believed by the grand jury, could have affected the outcome of the proceeding, we find the statement material. *See Mitchell v. State*, 608 S.W.2d at 228. For example, the evidence indicated she bore a baby, and one of the issues before the grand jury was whether she took the baby's life. Denying the passage of a baby and refusing to tell the grand jury what happened inhibited the grand jury's investigation. Even if appellant had admitted that she delivered a stillborn baby, this would have impacted the outcome of the proceeding because the investigation would have been furthered. Clearly, the statement "I did not pass a baby" had some substantial potential to obstruct justice. *See id.* Therefore, the evidence supports the essential elements of the crime of aggravated perjury beyond a reasonable doubt. *See Garrett v. State*, 851 S.W.2d at 857.

Accordingly, we conclude that the evidence was legally sufficient to support the jury's finding that (a) appellant made a false statement as alleged in the indictment and (b) the statement was material as a matter of law.

The judgment of the trial court is affirmed.