**Opinion filed April 4, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00010-CR

_____

## WILLIE HURST, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 70th District Court**

**Ector County, Texas**

**Trial Court Cause No. A-35,494**

### O P I N I O N

Willie Hurst, Appellant, appeals his capital murder conviction, for which he received a life sentence. In two issues, he complains that the trial court abused its discretion when it admitted an investigator's lay opinion of Appellant's involvement in the murder and when it

admitted evidence of weapons and ammunition that police discovered during valid searches of Appellant's residences.  We affirm.

## I.  Background and Trial Evidence

At the time of the murder, Appellant was squatting in an apartment after being evicted, and he was driving a Chevrolet Cavalier that he had recently stolen.  Appellant lived with his girlfriend—Heather Mitchell—and another couple—Derek Elms and Kathleen Newberry.  The group, along with Michael Organ—an occasional roommate—and Albert Levario—a neighbor, hatched a plan to rob Robert Thornhill.  Mitchell had dated Thornhill for about a month, and it was common knowledge that Thornhill was still in love with her.  Mitchell took advantage of Thornhill's feelings and used him for things like money, gas, rides, and cigarettes.  The plan was for Mitchell to call Thornhill and offer him sex in order to lure him to a specified location.  Then, when Thornhill arrived, the rest of the group was to appear, take anything of value, and beat him up.  Appellant knew of a "chop shop" in San Angelo where the group could sell Thornhill's pickup.

Mitchell contacted Thornhill one night and asked him for gas money; she asked him to meet her in a church parking lot.  While Mitchell waited in the stolen Cavalier, Appellant, Elms, Newberry, Organ, and Levario hid behind a nearby building.  Elms was armed with a crossbow, and Appellant had a bowie knife.  They waited for Thornhill for almost an hour, but he never showed.  Appellant and Elms were furious.  Now, the plan escalated—they decided to rob Thornhill and then kill him.

After Mitchell dropped off Newberry, Organ, and Levario, they tried again.  This time, Mitchell went to Thornhill's house.  The plan was for her to get Thornhill outside so that Appellant and Elms could rob him.  Once again, however, Mitchell was unsuccessful.

But the group was not deterred.  After cashing their paychecks, Appellant, Mitchell, Elms, and Newberry went out for dinner together.  During dinner, Thornhill began texting Mitchell. Mitchell read each of his text messages to the group; Appellant and Elms told her how to respond to Thornhill's text messages throughout dinner.  Appellant told Mitchell to say that she would sleep with Thornhill.  When the group learned that Thornhill rented a room at the Great Value Inn, they finished dinner and set their next plan in motion.  Appellant drove the group in the stolen Cavalier to find the perfect spot for their murder.  After rejecting two locations because there were people nearby, Appellant and Elms settled on a secluded alley.

Mitchell left them in the alley and drove the stolen Cavalier to the motel. This time, Elms had the bowie knife, and Appellant had the crossbow.

According to plan, Mitchell asked Thornhill to ride with her to sell marihuana to Elms. Mitchell drove; Thornhill was in the passenger seat. When they reached the alley, Elms tapped on the window, got into the backseat, and bought marihuana. Elms then reached into the front passenger seat, pulled back Thornhill's head, and sliced his throat down to the bone. Mitchell jumped out of the car, and Appellant leaned in and shot Thornhill with a crossbow. Mitchell said that she could hear Thornhill gasping for air as Appellant and Elms dragged him from the car. Mitchell said it sounded like Thornhill was drowning in water. Because Thornhill was still alive, they found a television nearby and slammed it on his head. Appellant and Elms took Thornhill's cell phone, pickup keys, and the key to his motel room. Then, using Thornhill's cell phone, Appellant took pictures of Thornhill's bruised and bloody body. They hid Thornhill's body under a nearby carport.

When Appellant and Elms joined the women in the stolen Cavalier, Appellant excitedly told them, "[T]his is addicting." Appellant drove the group to the Great Value Inn. Mitchell knew that Thornhill kept cash in the console of his pickup, and she told Elms; they split the cash. Appellant, Mitchell, and Elms searched Thornhill's motel room for "anything that they wanted." The couples returned to the apartment they shared; Elms and Newberry drove Thornhill's pickup, and Appellant and Mitchell drove the stolen Cavalier.

While they cleaned out the trunk of the stolen Cavalier and placed a blanket in the trunk, Appellant and Elms bragged to the women, Organ, and Levario about killing Thornhill. Appellant was "excited" and "bouncing" after the murder. Appellant and Elms drove the stolen Cavalier back to the alley where they had left Thornhill's body. Appellant and Elms retrieved Thornhill's body, burned it, and left it in a field. Thornhill's body was not found and identified until a month later.

Meanwhile, Appellant continued to brag about killing Thornhill. Appellant made phone calls and sent text messages from Thornhill's phone. Appellant showed the postmortem pictures he had taken with Thornhill's cell phone to several people and then claimed that Thornhill had a small penis. Appellant wanted to use Thornhill's house keys to break into and rob the home where Thornhill had lived with his parents. In spite of the bragging, Appellant and Elms were worried about getting caught. Appellant called an ex-girlfriend a few hours after the murder,

3

told her that he had "f----d up," and asked if they could talk, although Appellant never showed up. Appellant hid the bowie knife used to murder Thornhill at his grandmother's house, and everyone agreed to say that Elms had bought Thornhill's pickup for $1,000. Appellant also threatened to "beat the shit out of" Mitchell if she said anything. On another occasion, at a party where everyone knew about the murder, Appellant announced that "under no circumstances was he going to go back to jail." Before the police interviewed Mitchell, Appellant and Elms threatened to kill her and her family. No one ever came forward.

After many unanswered calls, voice mails, and text messages left for Thornhill, his family reported him missing and began posting flyers throughout Odessa. When Appellant saw one of the posters on the window of a local restaurant, Appellant tore it down, crumpled it up, and laughed. When Appellant passed a car that was plastered with the missing posters, he leaned out the window and exclaimed that "he did it." After the murder, the two couples moved out of the apartment and lived with Organ and his mother. Before long, Organ and both couples moved again. This time, they lived with Organ's friend, Douglas Reeves. Elms told Reeves about the murder, and Appellant admitted to killing Thornhill when Reeves asked.

One night, Elms and Organ were stopped for speeding; they were in Thornhill's pickup. Elms and Organ gave the agreed story and told police that Elms had bought the pickup from a friend who was moving out of town. The officers arrested them and impounded the pickup. Investigators interviewed over twenty people and settled on four suspects. They executed a search warrant at Organ's mother's home and found the stolen Cavalier in the backyard. Investigators found blood in the car and sent samples to the lab for testing. Police executed another search warrant at Reeves's home, where both couples were living, and seized, among other things, a crossbow, many knives and swords, and a large stash of ammunition. Appellant, Mitchell, Elms, and Newberry were arrested and charged with capital murder. After hours of interrogation, the investigators determined what had happened, and Appellant and Elms led police to the field where they had burned and left Thornhill's body.

## II.  Standard of Review

We review the decision to admit evidence for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 390–91 (Tex. Crim. App. 1991). We defer to the trial court's discretion and will not set aside a ruling without a showing in the record of an abuse of discretion. *Marras v. State*, 741 S.W.2d 395, 404 (Tex. Crim. App. 1987), *overruled in part on other*

4

*grounds by Garrett v. State*, 851 S.W.2d 853, 860 (Tex. Crim. App. 1993). If there is evidence supporting the decision to admit or exclude the testimony, the trial court did not abuse its discretion. *Carroll v. State*, 916 S.W.2d 494, 503 (Tex. Crim. App. 1996). We will affirm a trial court's ruling as long as it was within the zone of reasonable disagreement. *Montgomery*, 810 S.W.2d at 391.

### III. Analysis

#### A. Lay Opinion

In his first issue, Appellant complains that the trial court abused its discretion when it admitted "lay-witness opinion over [his] TEX. R. EVID. 701 objection." The State argues, however, that Appellant failed to preserve this issue for appeal because his "invades-the-province-of-the-jury trial objection in this case did not reference Rule 701, nor did it mention hearsay or subjective mental states."

"The doctrine which prohibited testimony that would invade the province of the jury 'is and has been long dead' as a proposition of law." *Mays v. State*, 563 S.W.2d 260, 263 (Tex. Crim. App. 1978) (quoting *Boyde v. State*, 513 S.W.2d 588, 590 (Tex. Crim. App. 1974)). The Court of Criminal Appeals recognized that, because TEX. R. EVID. 704 permits the admission of an opinion on the ultimate issue, an objection that testimony "'invades the province of the jury' is no longer a valid objection to opinion testimony." *Ortiz v. State*, 834 S.W.2d 343, 348 (Tex. Crim. App. 1992). Many Texas courts have concluded that the "province of the jury" objection is too imprecise to preserve error. *See, e.g.*, *Mock v. State*, 848 S.W.2d 215, 225 (Tex. App.—El Paso 1992, pet. ref'd). Nonetheless, the question is whether the objection was sufficiently specific "to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A).

For lay opinion testimony to be admissible, the opinion must be (1) rationally based on the perception of the witness and (2) helpful to better understand the witness's testimony or to determine a fact issue. TEX. R. EVID. 701; *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). The first requirement is composed of two parts. *Fairow*, 943 S.W.2d at 898. First, the witness must have personal knowledge of the events that inform the opinion, and second, the opinion must be rationally based on that knowledge. *Id.* at 898–900. As for the helpfulness requirement, there is no bright-line rule. Courts apply general relevance and balancing principles

and consider the complexity of the information from which the opinion was drawn to determine the helpfulness of the lay opinion. *See id.* at 900.

The testimony at issue here is the opinion of the lead investigator, W.J. (Tom) Carlisle, as to the extent of Appellant's involvement in the murder. The trial court had already admitted, without objection, Appellant's recorded statement and had published it before the jury. During the interrogation, Appellant had tried to minimize his involvement. The following exchange led up to the investigator's opinion:

> [PROSECUTOR] Q. Now, from the interview that you did with [Appellant], obviously, we heard a couple of different versions of what he said occurred. From your investigation were you able to determine whether or not as the interview ended, that he in fact told you the whole truth?
>
> [DEFENSE COUNSEL]: Your Honor, we object to that. That calls for a conclusion on this witness, and that is evading [sic] the province of the jury to make that determination.
>
> THE COURT: I will sustain the question to the form. You can restate it.
>
> [PROSECUTOR] Q. Okay. From your investigation, do you believe that [Appellant] was telling you the truth?
>
> [DEFENSE COUNSEL]: Your Honor, again, we are going to object to that. That evades [sic] the province of the jury.
>
> THE COURT: Sustain it to the form.
>
> [PROSECUTOR] Q. From your investigation did you get information contrary to what [Appellant] told you?
>
> A. Yes, ma'am.
>
> Q. And in the investigation or in the interview, he ended up his involvement was still minimized somewhat in this interview; is that correct?
>
> A. Yes, ma'am.
>
> Q. From your investigation did you learn information contrary to that?
>
> [DEFENSE COUNSEL]: Your Honor, again, we object to that form. It evades [sic] the province of the jury.
>
> THE COURT: overruled.

6

[DEFENSE COUNSEL]: Okay.

THE COURT: You can restate the question.

Q. Did you learn information contrary to what he told you when the interview ended up?

A. Yes, ma'am, we did.

Q. Okay. Did you in your investigation come across a crossbow? . . .

. . . .

A. Yes, ma'am. [State's Exhibit 61] is the crossbow that we took from where [Appellant] was found.

Q. And from your investigation can you tell me what you believe that [Appellant]'s involvement was in the capital murder of Robert Thornhill?

[DEFENSE COUNSEL]: Again, Your Honor, we object to that. It's calling for an opinion. An evasion [sic] of the province of the jury.

[PROSECUTOR]: And Judge, case law is clear that he can testify about his investigation.

THE COURT: I understand what case law says about that, but the form of the question is not appropriate. I am going to sustain the objection as to the form of the question.

[PROSECUTOR]: Okay. Based on your investigation what was [Appellant]'s involvement in the capital murder?

[DEFENSE COUNSEL]: Your Honor, again, because that's an invasion of the province of the jury. There has already been statements issued and all that calls for the witnesses to -- and we -- that will, being a question to be answered.

THE COURT: Overruled.

[DEFENSE COUNSEL]: Okay.

THE COURT: The witness may state his opinion.

A. The investigation also found out that the night prior to the murder that Derek Elms, [Appellant], the two ladies also, had tried to set up a deal with the victim to where he would meet them and bring them some narcotics. At that

7

point, they were going to take his narcotics, beat him up, steal his truck. And he didn't show up that night. That made them very angry.

So, the next night as we get into this, they had discussed from the time he didn't show up until the night of the murder what they were going to do. How they were going to go forward with this.

So, [Appellant] was part of the planning. He was there for all of the discussions on this. He took an active role in the execution and the murder.

He not only shot the crossbow at him, he supplied a shirt to help strangulate him. Once that was done, they moved the body. They left it. He went back and got the pickup with Derek Elms. They took the pickup back to the body. They loaded the body up, concealed it, drove it out, bought gas, took it way out of town, dumped it, poured gasoline on it.

After they came back into town, then he tried to hide evidence by having his grandmother maintain the knife. And I think that pretty much sums up the involvement as I can think of it.

Although the grounds are not apparent from Appellant's final objection, his prior "invading the province of the jury" objections were coupled with arguments as to the form of the question, calling for a conclusion, and calling for an opinion. Even if these grounds are sufficiently specific to preserve error, they do not comport with Appellant's complaint on appeal that Carlisle's testimony was based on hearsay, communicated a subjective mental state, and was not helpful to the jury. Appellant has waived that complaint.

However, even if we assume that the issue was preserved and even if we were to further assume, without deciding, that it was error to admit the investigator's opinion because the jury possessed the same information as the witness and could draw the proper inferences, the error would be harmless because the jury had the information from another source. *See Anguiano v. State*, 774 S.W.2d 344, 347 (Tex. App.—Houston [14th Dist.] 1989, no pet.) ("there was other testimony properly in evidence upon which the jury could reach its own determination"). Appellant's first issue is overruled.

*B. Admissibility of Weapons*

In Appellant's second issue, he complains that the trial court abused its discretion when it admitted testimony about firearms and ammunition found during a search of his residence because they were not probative of whether Appellant committed the charged crime. The State responds that these items were not offered to suggest that any of them were used in the murder

but, rather, "to corroborate the reasons expressed by Mitchell, Newberry, and Organ as to why they initially lied or were not forthcoming with police regarding the murder." We do not construe the State's argument to be that the evidence corroborated accomplice witness testimony because the evidence did not tend to connect Appellant to the murder. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005) (accomplice witness rule requires corroboration by "other evidence tending to connect the defendant with the offense"). Instead, we construe the State's argument that "Appellant himself opened that door by pushing the issue of these witnesses having initially lied" as arguing that the evidence was relevant to rehabilitate the credibility of Mitchell, Newberry, and Organ after attack on cross-examination.

The admissibility of corroborating or good-character evidence depends on when the evidence is offered. *Sledge v. State*, 686 S.W.2d 127, 129 (Tex. Crim. App. 1984). When an item of evidence is offered "to add credence or weight to some earlier unimpeached piece of evidence offered by the same party," this constitutes improper bolstering of a witness. *Id.* Once testimony is impeached, however, evidence corroborating the impeached testimony is admissible as a method of rehabilitating the witness. *Id.* But the right to rehabilitation is limited; a party "may rehabilitate the witness only in *direct* response to the attack." *Michael v. State*, 235 S.W.3d 723, 726 (Tex. Crim. App. 2007).

Mitchell, Newberry, and Organ explained that they initially lied to police because they were afraid of Appellant and Elms. Mitchell testified that they both threatened to kill her and her family and that Appellant told her that he would "beat the shit out of [her] if [she said] anything." Newberry testified that Appellant made an announcement to a group of people who knew about the murder that "under no circumstances was he going to go back to jail." Newberry said that the comment "was directed towards everyone that was there" and that she felt threatened. Organ explained that he feared retaliation against him and his mother because "they had a gun and they had all kinds of knives and stuff" and were staying in Organ's mother's home.

On cross-examination, Appellant questioned whether the witnesses were fearful of Appellant or merely lying to protect themselves. Appellant asked Mitchell about living with Appellant and her intention to marry Appellant during the time that she was allegedly afraid. Appellant pointed out that Mitchell said she was afraid of Elms in her initial statements and attempted to protect Appellant. When asked whether he lied because he was "trying to cover

[his] own hiney," Organ denied it and said that he had nothing to do with the murder. Appellant questioned why Organ failed to mention the murder until after he was under indictment for unrelated charges.

Later, the State offered evidence of several weapons and large amounts of ammunition that had been seized pursuant to a valid search warrant prior to Appellant's arrest. The State explained that the evidence was relevant because "we have witnesses [who testified] that they felt threatened" and because the evidence was "just corroboration that [Appellant and Elms] were capable and had the ability with the equipment to carry out those threats." The trial court admitted the evidence and instructed the jury that it was to consider the evidence only "for corroboration of any prior witnesses' testimony." A criminal investigator testified that the items seized from Appellant's residences included four ammo boxes filled with various-sized shotgun shells, a cardboard box containing rounds of various calibers, shotgun pulls, a full twenty-pound keg of pistol powder, a camouflaged crossbow, several steel bowie knives, a large survival knife, three throwing knives, a dagger, and four swords.

The evidence is relevant to support the witnesses' explanations that they lied to police because they were scared. Because we conclude that the evidence was relevant, we must determine if the record reveals that the trial court abused its discretion in choosing to admit the evidence. Appellant's argument against admissibility is threefold. First, he argues that "there was no evidence that the guns, ammunition, or knives" belonged to or were used by him. We do not find this argument persuasive because the evidence was offered to show that Appellant had the ability to carry out his threats. Therefore, to corroborate the witnesses' testimony, there is no requirement that the evidence show that Appellant owned or had used the weapons but, rather, that he merely had access to them. Second, Appellant seems to argue that Organ and Newberry could not have been fearful when there were no specific threats against either of them. Further, Appellant contends that Mitchell's and Newberry's testimony was "inherently suspect" because they were accomplices, lied throughout the investigation, and had motive to "paint [Appellant] in a poor light" to obtain a favorable plea. This is unpersuasive as well because the trial court does not weigh a witness's credibility to make an admissibility determination. *See Montgomery*, 810 S.W.2d at 390 n.3 (explaining that a trial court should not consider a witness's credibility when determining whether to exclude evidence).

Finally, Appellant argues that, even if relevant, "such evidence was introduced simply to inflame the jury members' passions and fears against [Appellant]" and to "distract the jury from the main issue of the case." Appellant alleges that the "evidence wrongly established in the jury's mind that [Appellant] owned and/or possessed these items" and that it "wrongfully played upon the jury's emotions and fears, particularly when the use of guns was never discussed." The State argues, however, that evidence that Appellant owned weapons and ammunition could not possibly have caused unfair prejudice because other uncontroverted evidence "established that Appellant carefully planned this crime out of anger." The State further contends that the probative value of showing that the witnesses feared Appellant is not substantially outweighed by the minimal prejudice, "[g]iven the overwhelming heinousness of Appellant's actions."

The question here is not whether the relevant evidence is prejudicial or confuses the issues, but whether its probative value is *substantially outweighed* by such dangers. *See* TEX. R. EVID. 403. Trial courts have "wide latitute" in evaluating the probative value of evidence offered in relation to its prejudicial effect. *Montgomery*, 810 S.W.2d at 390. The record before us does not demonstrate that the trial court abused its discretion when it allowed evidence before the jury of the weapons and ammunition that police found in a search of Appellant's last two residences in light of the allegations that Appellant had threatened three witnesses. Moreover, the trial court instructed the jury to consider the evidence only for the purpose of corroborating prior witness testimony. Appellant's second issue is overruled.

*This Court's Ruling*

We affirm the judgment of the trial court.


MIKE WILLSON

JUSTICE


April 4, 2013

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.

11