

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

## 02-22-00296-CR

_____

CHHOUN SAING, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1755469R

---

Before Bassel and Womack, JJ.; and Lee Gabriel (Senior Justice, Retired,
Sitting by Assignment)
Memorandum Opinion by Justice Gabriel

# MEMORANDUM OPINION

Chhoun Saing was charged in count one of a two-count indictment with aggravated kidnapping. *See* Tex. Penal Code Ann. § 20.04(a)(4). He was charged in count two with evading arrest or detention using a motor vehicle. *See id.* at § 38.04(b)(2)(A). Both offenses were alleged to have occurred on July 2, 2021. The indictment also contained a motor vehicle as a deadly weapon notice alleging that during the commission of these felonies, Saing used a deadly weapon. The jury found him guilty of both counts and found that Saing did use a deadly weapon in the commission of the offenses. The jury assessed Saing's punishment for aggravated kidnapping at thirty years' confinement in prison. On count two, the jury assessed ten years' confinement in prison and a $10,000 fine. In his first issue, Saing contends that the trial court erred by admitting evidence that he was wearing a GPS monitor prior to his commission of the offenses alleged at trial. In his second issue, Saing argues that the fine should be deleted from the judgment because the court failed to orally pronounce a fine at sentencing. We affirm.

# I. BACKGROUND[1]

Tara[2] and Saing met late in 2019 and began dating immediately. At trial, Tara acknowledged that she noticed "red flags" early in the relationship with Saing that demonstrated controlling behavior by him. Saing assaulted Tara for the first time in May of 2020. Saing's assault on that day began in a house, continued on the street as she tried to leave, and culminated with his forcing her into his car and backhanding her in the eye socket. Ultimately, Saing drove Tara to her mother's home on Ridglea Country Club Drive in Fort Worth and dropped her off. Tara's mother took her to the hospital for treatment of her injuries. While the police were called, Tara explained that she did not call them and she believed that either the nurses or her mother had done so.[3]

---

[1]Saing does not challenge the sufficiency of the State's evidence against him, nor does he argue that the evidence of the numerous extraneous domestic assaults was improperly admitted. While the relationship between the victim of the aggravated kidnapping and Saing spanned two to three years and involved numerous incidences of physical aggression by Saing, a complete account of their time together does not bear on the issues in this case. Therefore, we will dispense with a lengthy recitation of the factual background and confine our discussion to the facts only as needed for context and to resolve the issues raised.

[2]To protect the victim's identity, we refer to her by a fictitious name. *See* Tex. Const. art. I, § 30(a)(1); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982); Tex. R. App. P. 9.8 cmt.; Tex. App. (Fort Worth) Loc. R. 7.

[3]Despite the physical violence Tara endured, she did not want Saing to go to jail. At a bond hearing, Tara testified to the court that she still did not want Saing to be in jail and that she had signed affidavits of non-prosecution for Saing's counsel. On cross-examination by Saing's counsel, Tara told the jury that she never wanted him in jail. Tara also testified that while she never wanted to pursue legal action, on at

3

Tara testified that after this event she wanted to believe that it was a one-time thing and that she had no hard feelings, so she decided to live with Saing. Tara then described how things between them "immediately" went bad. Tara recounted for the jury how Saing would go through her emails or the pictures on her phone and react violently when he discovered something he did not like. She explained that "it was like the arguments never ended. It continued to be a rollover argument." Saing's physical aggression escalated over time, which resulted in multiple trips to the hospital for Tara.

In December of 2020, Tara left the residence she shared with Saing and moved in with her mother at the Ridglea Estate Condominiums. Tara described the location of the building and explained that there was only one way in and one way out of the condominiums off of Ridglea Country Club Drive. She further described the layout of the condominium building and, with the aid of exhibits, showed the jury the front of the condo that she and her mother resided in and the doors of her upstairs neighbor Jamie Johnson and her downstairs neighbor Delight.

Tara then told the jury about the events that took place at her mother's condo on May 20, 2021. She testified that Saing came to the residence while both she and her mother were home. They told Saing that they were traveling to Florida the next day. When Tara's mother left, an argument ensued, and Saing began throwing and

least one occasion she did call law enforcement to extricate herself from the abusive events.

destroying items in the home. He also began throwing things at Tara and "smacked" and "punched" her. When Tara went outside on the patio to get away from Saing, he followed her and told her that he was going to get a bag to tie her up. When he went to the kitchen, Tara ran upstairs to Johnson's condo. She explained that she burst into his residence without knocking and was crying and that Johnson called 911. Tara described how Saing yelled at her to come downstairs but that when she didn't, he left in his truck before the police arrived. Officer Jerry Snyder responded to the 911 call, and body-cam footage was admitted showing the officers searching the condo of Tara's mother at 3:00 p.m. Tara and her mother left town for a week after this occurred.

Upon returning to town, Tara testified that she went to another location because she was scared and she "stayed hidden from him for six weeks." Tara's mother testified about the early morning hours of June 13, 2021, when Saing came to her condo uninvited. This was during the period of time that Tara stated she was hiding from Saing. Tara's mother explained to the jury that she was alone in her home at the time when she heard someone knocking on her front door. When she went into her kitchen, she could see the truck she recognized as Saing's parked outside. Tara's mother testified that she did not answer the front door and Saing then went around to the back and started "knocking and banging at the back door." She testified that when she looked out the blinds, she recognized Saing, and she identified him in court. She described the banging on the back door as hard enough to make

5

the door shake. She related that this frightened her and she called 911. When the police arrived, Saing had already left. Officer Callie Tuckness testified that she was the responding officer to this call, and her report showed the call time to be 5:05 a.m. on June 13, 2021.

Tara explained that after several weeks had passed without hearing from Saing, she went back to her mother's condo on July 1 even though her mother was away for work. On July 2, Tara expected a friend to visit her and take her to the grocery store. While waiting on her friend, she received a message from Saing, and she decided to call him. During the conversation, he became angry, started calling her names, and asked where she was. Tara told him she was home and although she hung up, the fighting continued through messages. Tara testified that she was still expecting her friend, and when she heard a vehicle drive up, she went outside to the back porch. As soon as she did, she saw Saing "charging" at her, and she stated that she knew he was going to hurt her. She explained that she tried to run back inside and he grabbed her and hit her while she gripped the stairs because "he was dragging me to the truck." Tara described how she tried to resist being taken while he was punching her, pulling her hair, and screaming at her. She conceded that he was stronger than she was and that he was able to force her into his truck as a result. When he threw her in his truck, she did not have any shoes on and did not have her phone.

Tara testified that throughout the time in the vehicle, Saing continued to punch her and hit her in the face. She described how she begged him to take her home

6

because her face was so swollen and because he had knocked one of her teeth out. He even used a hammer to hit her hand and "kept telling [her] to shut up and quit crying or he was going to hit [her] in the head." Tara convinced Saing that she would go with him if he would take her back to the condo to get her shoes and phone. While there, she was able to escape to Delight's residence, and Delight called 911. Before the police could arrive, Saing left in his vehicle. Although the police tried to look for his vehicle, they only located him when he returned to Tara's condo. The police tried to detain him, but he fled at excessive speeds, causing an accident with another vehicle and eventually causing his vehicle to crash into a house. Saing then fled on foot but was ultimately apprehended.

Albert Santos, the regional manager of Recovery Monitoring Solutions, testified that Saing was wearing a monitoring device that tracked his location on May 20, 2021, and June 13, 2021, and that the device was working properly on those days. Santos described how the device operated and then used business records to demonstrate where Saing's device was on those two days. Starting with May 20, 2021, the tracking device worn by Saing showed him to continuously be at an address on Ridglea Country Club Drive from 12:01 p.m. to 2:37 p.m. Santos further testified that the tracking device showed Saing arriving at the parking lot at the same address on Ridglea Country Club Drive on June 13, 2021, at 3:14 a.m. and leaving at 3:18 a.m. Then approximately 30 minutes later, the tracking device arrived in front of the complex and then moved into the complex. The tracking device then shows the

7

vehicle departed the location at 5:07 a.m. The device returned to the property at 4:25 p.m. and moved around the location until it departed at 4:33 p.m. Finally, Santos testified that the tracking device returned to the property at 6:58 p.m. but never made any stops.

The jury found Saing guilty of count one (aggravated kidnapping) and of count two (evading arrest) and found that he had used a deadly weapon in the commission of the offenses. The jury assessed 30 years' confinement in the Institutional Division of the Texas Department of Criminal Justice on count one and ten years' confinement and a $10,000 fine on count two. The trial judge read the jury's verdict in Saing's presence and then sentenced him. A written judgment was signed by the trial court, and Saing appealed.

## II. GPS MONITORING INFORMATION

In his first issue, Saing contends that the trial court abused its discretion by overruling his objections to the testimony of Santos based on the tracking device information from May 20, 2021, and June 13, 2021. Saing's defense counsel objected to the testimony concerning the tracking device when it was offered before the jury based on Tex. R. Evid. 401, Tex. R. Evid. 403, Tex. R. Evid. 404(b), and Article 38.371 of the Texas Code of Criminal Procedure. He had maintained the same objections through multiple hearings outside the presence of the jury. At the conclusion of the hearings, the trial court limited the State to testimony regarding where Saing's tracking device showed him to be located on May 20, 2021, and

8

June 13, 2021. The prosecution agreed not to elicit testimony as to why Saing was wearing a GPS monitor and not to allude to the fact that Saing had other pending cases involving prior assaults on Tara.[4] In allowing the limited testimony of Santos, the trial court specifically found "that the probative value is not substantially outweighed by the prejudicial [effect]."

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *James v. State*, 623 S.W.3d 533, 541 (Tex. App.—Fort Worth 2021, no pet.). A trial court does not abuse its discretion as long as the decision to admit or exclude evidence is within the zone of reasonable disagreement. *Henley v. State,* 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Merrick v. State*, 567 S.W.3d 359, 375 (Tex. App.—Fort Worth 2018, pet. ref'd). We will uphold the trial court's correct decision under any applicable legal theory. *De La Paz,* 279 S.W.3d at 344; *Qualls v. State*, 547 S.W.3d 663, 675 (Tex. App.—Fort Worth 2018, pet. ref'd).

### A. Admissibility under Article 38.371 and Rule 401

On appeal, Saing argues that the trial court abused its discretion by admitting the tracking information testimony showing his location on May 20, 2021, and June 13, 2021. He argues that the evidence was not relevant to the allegations on trial

---

[4]Saing was ordered to wear the tracking device as a condition of bond from prior cases.

which occurred on July 2, 2021, and that the testimony showing Saing "was fitted with a GPS monitor implicitly raises the fact that Appellant was under criminal justice supervision; thus reasonably assuming the role of 'propensity' or 'character' evidence."

Article 38.371 applies to family-violence prosecutions and expressly allows "evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . ., including testimony or evidence regarding the nature of the relationship" between the accused and the complainant. Tex. Code Crim Proc. Ann. art. 38.371(b), (c). Although the statute explicitly prohibits the admission of character evidence that is otherwise prohibited by the Rules of Evidence or other laws, Article 38.371(b) expressly allows extraneous-offense evidence. The evidence concerning the May 20, 2021 assault of Tara at her mother's condominium shows the nature of the relationship between Tara and Saing and was an extraneous offense that the State was required to prove beyond a reasonable doubt.[5] *See Harrell v. State*, 884 S.W.2d 154, 157 (Tex. Crim. App. 1994). The GPS monitor showed Saing to be at the location of the assault from 12:01 p.m. to 2:37 p.m. The police were called by Johnson as soon as Tara entered his condo,

---

[5]The trial court gave the appropriate admonishment and limiting instruction concerning the State's offer of extraneous-offense testimony both orally at the time the testimony was offered and in writing in the guilt or innocence charge. *See* Tex. R. Evid. 105(a); *Ex parte Varelas*, 45 S.W.3d 627, 631 (Tex. Crim. App. 2001); *Allen v. State*, 47 S.W.3d 47, 50 (Tex. App.—Fort Worth, 2001 pet. ref'd).

and the body-cam footage of the officer who arrived and searched Tara's mother's apartment showed that search started at 3:00 p.m.

The uncharged acts complained of were admissible and relevant under Article 38.371(b). "Areas of relevant and admissible extraneous-offense evidence that complies with [A]rticle 38.371 include evidence that (1) explains why a victim of domestic violence is unwilling to cooperate with prosecution . . . [and] (3) contextualizes the nature of the relationship between victim and assailant." *Fernandez v. State*, 597 S.W3d 546, 566 (Tex. App.—El Paso 2020, pet. ref'd); *see Mourning v. State*, No. 02-10-00168-CR, 2020 WL 6165309, at *5 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op., not designated for publication). The testimony of Saing's location at the time of the offense would tend to make the fact that he was there more probable than it would be without the evidence and is relevant under Tex. R. Evid. 401. Defense counsel also questioned Tara about her unwillingness to cooperate with law enforcement and her willingness to sign non-prosecution affidavits. The extraneous offense was admissible to explain the nature of Tara's relationship with Saing and could explain her reluctance to cooperate. The trial court did not abuse its discretion by admitting the location testimony for May 20, 2021, and overruling defense counsel's objections based on Article 38.371 and Tex. R. Evid. 401. *See James,* 623 S.W.3d at 546.

Tara's mother testified to the events that took place in the early morning hours of June 13, 2021, when Tara was hiding from Saing. Tara's mother described how

Saing came to her residence uninvited; knocked on her front door; and when she didn't answer, went to the back of her condo and knocked on the back door so hard that it shook. She testified that she was frightened and called 911. Officer Tuckness testified that the call came in at 5:05 a.m.

The first question asked by defense counsel on cross-examination was: "You never actually saw Mr. Saing at the apartment that evening that you heard the banging on your door, did you?" Saing's counsel raised the issue of Saing's presence at Tara's mother's house on June 13, 2021. Santos testified that on June 13, 2021, the tracking device showing Saing's whereabouts located him at the same location as May 20, 2021, on Ridglea Country Club Drive. Santos testified that Saing came to the location and left four separate times on June 13, 2021. He arrived one minute past midnight and stayed for over two hours until 2:37 a.m. He came back at 3:14 a.m. and stayed for four minutes and then retuned at 3:48 a.m. and stayed for over an hour until 5:07 a.m.

The monitoring information was admissible under Article 38.371 to prove the nature of the relationship and was relevant under Rule 401. Defense counsel attacked the identification of Saing by Tara's mother. The evidence offered of Saing's location was in direct response to the attack on the credibility of the identification of Saing. *See Michael v. State*, 235 S.W.3d 723, 726 (Tex. Crim. App. 2007); *Hurst v. State*, 406 S.W.3d 617, 624 (Tex. App.—Eastland 2013, no pet.) The testimony could assist the trier of fact in determining whether Saing was the person banging on the doors at

12

Tara's mother's home. The testimony had established that Tara was hiding from Saing, and the return and prolonged visits to the only location where he knew her to live was evidence the jury could consider that contextualized their relationship and related to the testimony that Saing had a need to control Tara. *See Fernandez*, 597 S.W.3d at 566. The testimony of Saing's location at these times when he did not know where Tara was living was relevant to the charged offense that occurred once he did locate her. The trial court did not abuse its discretion by admitting the testimony and overruling defense counsel's objection based on Article 38.371 and Tex. R. Evid. 401. *See Gadsden v. State*, No. 02-21-00195-CR, 2023 WL 2607559, at*4 (Tex. App.—Fort Worth March 23, 2023, no pet.) (mem. op. not designated for publication) ("Article 38.371 of the Code of Criminal Procedure provides another non-character-conformity purpose for admitting extraneous-offense evidence, which is evidence of 'all relevant facts and circumstances' that may assist a trier of fact in a family violence prosecution." (quoting Tex. Code Crim. Proc. Ann. art. 38.371)).

### B. Admissibility Under Tex. R. Evid. 404(b) and 403

Evidence that does not have relevance apart from character conformity is inadmissible. Tex. R Evid. 404(b). Extraneous-misconduct evidence is not inadmissible under Rule 404(b) if it is relevant to a fact of consequence other than its tendency to show conduct in conformity with character. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *Johnston v. State*, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004). "This evidence may be admissible for another purpose, such as proving

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b). This list is "neither mutually exclusive nor collectively exhaustive." *Montgomery v. State*, 810 S.W.2d 372, 377 (Tex. Crim. App. 1990). Saing did not complain on appeal that the extraneous assault of May 20, 2021, was inadmissible nor does he complain that the testimony of Tara's mother concerning the events of June 13, 2021, was error. Instead, he complains that the testimony concerning the GPS monitor and his location during the relevant events on those days constitutes character evidence and thus was inadmissible under Rule 404(b). We disagree.

In the Rule 404(b) analysis, we first answer whether the evidence of Saing's location was relevant under Rule 401. *Rogers v. State*, 853 S.W.2d 29, 32 (Tex. Crim. App. 1993); *Mayes v. State*, 816 S.W.2d 79, 84–87 (Tex. Crim. App. 1991). We have already concluded that the evidence is relevant to the material issue of identity. The evidence complained of also bears on the element of intent. We hold that the evidence of Saing's location on the two dates at issue is relevant. *See Longoria v. State*, No. 09-13-00169-CR, 2014 WL 2922236, at *3 (Tex. App.—Beaumont June 25, 2014, pet. ref'd) (mem. op., not designated for publication) (concluding that trial court did not err by admitting GPS evidence because it was relevant to a material issue and was admissible for a purpose other than character conformity under Rule 404(b)).

The next issue to be resolved is whether the location evidence is admissible as an exception under Rule 404(b). *Rogers*, 853 S.W.2d at 33. The entirety of the

14

evidence clearly established a pattern of physical abuse of Tara by Saing. Saing had to find Tara to commit these offenses, and the location information on Saing evidences that he was attempting to do just that. While Saing was being monitored, he was monitoring the only location he knew Tara returned to regularly. The challenged evidence fell within the exceptions contained in Rule 404(b) of opportunity, preparation, plan, and identity. Further, extraneous misconduct evidence is admissible to corroborate certain kinds of testimony such as to rehabilitate a witness after an attempt to impeach that witness. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). Defense counsel attempted to impeach Tara's mother's identification of Saing as the individual at her home on June 13, 2021. Because it had relevance apart from character conformity, the trial court did not abuse its discretion in admitting the monitoring information despite Saing's Rule 404(b) objection.

Saing also argues that even if the location evidence is admissible under Rule 404(b), it is not admissible under Rule 403. Evidence is inadmissible under Rule 403 if its probative value is substantially outweighed by a danger of unfairly prejudicing the defendant, confusing the issue, misleading the jury, causing undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403; *James*, 623 S.W.3d at 546; *Emich v. State*, No. 02-18-00059-CR, 2019 WL 311153, at *7 (Tex. App.—Fort Worth Jan. 24, 2019, not pet.) (mem. op., not designated for publication). When considering if evidence is admissible despite a Rule 403 objection, the trial court must conduct a balancing test. The trial court did so and explicitly found "that

15

the probative value is not substantially outweighed by the prejudicial [effect]." When a Rule 403 objection is made, the trial court must engage in a balancing process that considers: (1) how compellingly the extraneous-offense evidence serves to make a fact of consequence more or less probable; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and (4) the proponent's need for the evidence. *Perkins v. State*, 664 S.W.3d 209, 216–17 (Tex. Crim. App. 2022) (citing *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999)). The balance is always slanted toward admission of relevant evidence because Rule 403 carries a presumption that relevant evidence will generally be more probative than prejudicial. *De La Paz*, 279 S.W.3d at 343 & n.17.

"If judicial restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Montgomery*, 810 S.W.2d at 379 (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir. 1978)). We reverse a trial court's ruling under Rule 403 "rarely and only after a clear abuse of discretion." *Perkins*, 664 S.W.3d at 217.

We have held that the evidence was relevant under Rule 401 and admissible under Rule 404(b) and Article 38.371. As for the trial court's ruling on the Rule 403 objection, we find that it was not so clearly wrong as to lie outside that zone which reasonable persons might disagree and was not an abuse of discretion. *See Henley*,

493 S.W.3d at 83 (citing *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)). Even though the State had other evidence to support the indicted charges, the GPS monitor evidence had significant probative value in corroborating Tara's account of her relationship with Saing and the allegations of May 20, 2021, and June 13, 2021. The testimony concerning Saing's whereabouts on those two days demonstrates why Tara did not cooperate with the police when others made reports and also provides evidence of identity, opportunity, preparation, and plan.

Further, the evidence had minimal potential for unfair prejudice and required little time to present. It must be remembered that Saing has not complained about the acts that he allegedly engaged in on the two days in question but, instead, only complains about testimony concerning the GPS monitor. The location testimony by Santos was no more serious or damaging than the allegations made by Tara or even by Tara's mother. *See Dies v. State*, 649 S.W.3d 273, 286 (Tex. App.—Dallas 2022, pet. ref'd) (stating that the potential for unfair prejudice is reduced, relatively, where the extraneous offense is "no more serious than" the charged offense). Moreover, any tendency to draw impermissible inferences of character conformity "can be minimized through a limiting instruction," and the trial court gave that instruction both orally and in the court's charge. *See Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996). The GPS monitoring testimony consumed nine pages of the record, not all of which were devoted to testimony about the dates in question. There were roughly 250 pages of testimony presented to the jury in the guilt or innocence

17

portion of the trial. This use of time was not excessive and would not distract from the jury's consideration of the charged offenses. *See id.* at 520.

We conclude that the trial court could reasonably decide that the probative value of the GPS monitoring evidence was not substantially outweighed by the danger of unfair prejudice. Because the trial court did not abuse its discretion by admitting this evidence, we overrule Saing's first issue.

### III. IMPOSITION OF FINE

In his second issue, Saing argues that the fine assessed by the jury on count two for the conviction for evading arrest or detention with a motor vehicle should be deleted from the judgment because the fine was not pronounced orally by the trial court at sentencing. It is true that the trial court did not pronounce the fine in count two when the defendant was formally sentenced. It is also true that the jury assessed a fine of $10,000 on count two and that the fine is included on the trial court's written judgment. Although unrecognized in Saing's briefing, it is also true that the trial court read the jury's punishment verdict for count two, including the $10,000 fine, in the presence of the jury and Saing.

The Texas Court of Criminal Appeals has clearly resolved this issue for us. *See Ette v. State*, 559 S.W.3d 511, 515–517 (Tex. Crim. App. 2018). A fine is punitive in nature and intended to be part of a defendant's sentence and therefore must be orally pronounced. *Armstrong v. State*, 340 S.W.3d 759, 767 (Tex. Crim. App. 2011); *see also* Tex. Code Crim. Proc. Ann. art. 42.03, § 1(a) (court shall pronounce sentence in

18

defendant's presence). Generally, when there is a conflict between the oral pronouncement of a sentence and the written judgment, the oral pronouncement controls. *Taylor v. State*, 131 S.W.3d 497, 500 (Tex. Crim. App. 2004). But *Ette*, the court of criminal appeals held that "a jury's lawful verdict on punishment is inviolate, and the trial court must abide by it." *Ette*, 559 S.W.3d at 517.

In *Ette*, the jury assessed punishment for a first-degree felony to be ten years' confinement and a $10,000 fine. *Id.* at 513. "The trial court read the verdict form aloud on the record in [Ette's] presence." *Id.* This exact same scenario occurred in Saing's case. In each of these cases, the defendant elected to have the jury assess his punishment as was his right. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 2(b). As again was their right, each defendant was present when the verdict was read aloud by the trial court. *See* Tex. Code Crim. Proc. Ann. art. 37.04.

Saing argues that there is an absolute rule that oral pronouncement controls over the written judgment. The court of criminal appeals disagreed and reasoned that "[a]pplying an absolute rule that the oral pronouncement controls would improperly supplant the role of the jury." *Ette*, 559 S.W.3d at 517. The court reasoned that "a rule that the oral pronouncement controls over the written judgment should not apply to unambiguous lawful jury verdicts." *Id.* at 515. A jury's lawful verdict must be imposed as the trial court's judgment. *Id.* at 517. We overrule Saing's second issue.

## IV.  CONCLUSION

Having overruled both of Saing's issues, we affirm the judgment of the trial court.

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 18, 2024